[Cite as *State v. Reed*, 2016-Ohio-5123.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

PAUL A. REED

    Appellant

C.A. No.    27755

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 2014 04 1179 (B)

DECISION AND JOURNAL ENTRY

Dated: July 27, 2016

SCHAFER, Judge.

**{¶1}** Defendant-Appellant, Paul Reed, appeals the judgment of the Summit County Court of Common Pleas convicting him of murder. For the reasons that follow, we affirm the trial court's judgment.

I.

**{¶2}** The Summit County Grand Jury indicted Reed on one count of aggravated murder in violation of R.C. 2903.01(A), an unspecified felony, and one count of complicity to commit aggravated murder in violation of R.C. 2903.01(A), 2923.03. The indictment arose from the murder of James Harris on April 26, 2014 after Reed plotted with his girlfriend, Tiffany Powell, to lure Mr. Harris to a residence on Minota Avenue where he was beaten to death. The matter proceeded to a jury trial at which the following evidence was offered.

**{¶3}** Powell has five minor children with Mr. Harris but, at the time of Mr. Harris's death, they were no longer in a relationship and Mr. Harris had custody of the children. Powell

contacted Ro'ceeda Kelly, one of her friends, and offered to pay her $100 if she helped in a plot to lure Mr. Harris to the Minota Avenue residence. Powell said that the purpose of the plot was to entrap Mr. Harris into violating a civil protection order, which Powell said would help her regain custody of the children. Ms. Kelly agreed because she wanted Powell to have custody of the children.

{¶4} The plot called for Ms. Kelly to contact Mr. Harris and tell him that she wanted to sell a vehicle to him. Mr. Harris, a retired Marine who still worked on vehicles for resale, would then be instructed to meet Ms. Kelly at the Minota Avenue residence. Once he arrived, Ms. Kelly was supposed to lead Mr. Harris to the back entrance of the house and down to the basement. According to Ms. Kelly, neither Powell nor Reed mentioned to her what would occur once she went inside the house with Mr. Harris and she did not expect any violence. Instead, Reed simply told her that he would "take care of it."

{¶5} Reed drove his vehicle to pick up Ms. Kelly. Powell was seated in the front passenger seat with Reed. The three then drove to Mr. Harris's house so that Ms. Kelly could make her initial contact with him. Reed parked his vehicle around the corner from Mr. Harris's house so that it could not be seen. Ms. Kelly walked to the house, but Mr. Harris was not home. Rather, she spoke with one of his acquaintances who was at Mr. Harris's house to work on one of his other vehicles. She told the acquaintance about the vehicle she wanted to sell to Mr. Harris and then returned to Reed's vehicle. The acquaintance told Mr. Harris about the offer upon his return to the house.

{¶6} Reed, Powell, and Ms. Kelly drove around and made a couple of stops before Reed and Powell gave a Tracphone to Ms. Kelly and instructed her to call Mr. Harris and discuss the vehicle. Mr. Harris did not answer but he eventually called the Tracphone back and he

arranged to meet Ms. Kelly later that evening at the Minota Avenue residence, which she said was her residence, pursuant to Powell's instructions. Ms. Kelly, Reed, and Powell then went to the Minota Avenue residence, parked around the corner so it could not be seen near the house, and they sat in the garage waiting for Mr. Harris to come. When Mr. Harris called Ms. Kelly, Powell told her what to say.

{¶7} Mr. Harris attended a charity fundraiser before driving to pick his adult son up so that they could look at the vehicle together. Mr. Harris's son testified that he was unable to see any gun on Mr. Harris during their trip to the Minota Avenue residence and he indicated that he never knew Mr. Harris to have a firearm. Once they arrived at the residence around 10:15 p.m., Ms. Kelly was standing at the end of the driveway in front of the house and she told Mr. Harris to go to the back entrance since the carpets in the front room were wet from cleaning. Mr. Harris's son stayed in the vehicle, which was parked in the driveway.

{¶8} Ms. Kelly testified that Mr. Harris was "nice" when he arrived and that she was unable to see a gun on him. Nevertheless, she led him to the back entrance of the house and then down the stairs to the residence's basement. After taking one step from the stairwell into the basement, Reed swung a pole and hit Mr. Harris in the face. This action scared Ms. Kelly, who was almost hit by the pole herself, and she immediately ran out of the house to the neighbor's yard.

{¶9} Police were dispatched to the scene on a "fight call" and they were informed that a gun was possibly present. This dispatch was received shortly after Mr. Harris entered the residence. Upon their arrival on the scene, they discovered Mr. Harris's body as well as a gun that had one bullet in the chamber and a detached magazine close to it. The gun was discovered within arm distance of Mr. Harris's body and Mr. Harris's DNA was found on the magazine.

Reed was present in the basement when police arrived and an analysis of his hands showed the presence of Mr. Harris's DNA. Powell was on the main level of the residence when police arrived. Both Reed and Powell were transported to the police station, where they gave "conflicting" accounts of the night's events. Moreover, both of them denied that Ms. Kelly was even present during the night's events, which police later disproved.

{¶10} The Summit County Medical Examiner performed an autopsy on Mr. Harris. She identified the cause of death to be blunt force trauma and the manner of death to be homicide. From the nature of Mr. Harris's various injuries to his face, neck, and back, the Medical Examiner concluded that it was likely that someone kneeled on Mr. Harris's back while "repeatedly" beating his head into the ground. Also, the Medical Examiner noted that there were no defensive wounds present on Mr. Harris's body and she opined that Mr. Harris's injuries were inconsistent with a scenario of mutual combat.

{¶11} Reed requested that the jury receive a self-defense instruction, but the trial court denied that request. The trial court did instruct the jurors on the lesser-included offenses of murder and involuntary manslaughter. The jury found Reed not guilty of aggravated murder and complicity to commit aggravated murder, but it found him guilty of the lesser included offense of murder and complicity to commit murder. After merging the convictions for sentencing, the trial court subsequently imposed an indefinite prison term of 15 years to life for Reed's murder conviction.

{¶12} Reed filed this timely appeal, which presents four assignments of error for our review. Because the first and second assignments of error implicate similar issues, we elect to address them together. And, since the resolution of the third assignment of error impacts the

resolution of the first and second assignments of error, we elect to address the third assignment of error first.

## II.

### Assignment of Error III

**The trial court erred in failing to grant Mr. Reed's motion for self-defense instruction in the jury instructions.**

{¶13} In his third assignment of error, Reed argues that the trial court abused its discretion by failing to give a self-defense jury instruction. We disagree.

{¶14} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. In line with this requirement, jury instructions must "present a correct, pertinent statement of the law that is appropriate to the facts." *Id*. When determining whether the challenged jury instructions comply with this requirement, we review for an abuse of discretion. *State v. Norris*, 9th Dist. Lorain No. 14CA010699, 2015-Ohio-5180, ¶ 25. An abuse of discretion is more than an error of judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, we may not simply substitute our own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶15} When reviewing the trial court's decision to not issue a self-defense instruction in this matter, we are mindful that self-defense is an affirmative defense and that the defendant has the burden of proving it by a preponderance of the evidence. *State v. Cornwell*, 9th Dist. Wayne

No. 14AP0017, 2015-Ohio-4617, ¶ 19, citing R.C. 2901.05(A). In order to avoid criminal liability on the basis of self-defense, the defendant must prove the following:

> "(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger."

*State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997). "The trial court is not required to instruct the jury on self-defense in every situation in which the presentation is attempted; rather, a trial court need only instruct the jury on self-defense if the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable [jurors] concerning the existence of such issue." (Internal quotation and citation omitted.) *State v. Hatfield*, 9th Dist. Summit No. 23716, 2008-Ohio-2431, ¶ 8. With these principles in mind, we turn to Reed's argument.

{¶16} Reed first contends that he offered sufficient proof to establish that he was not at fault in creating the violent situation that led to Mr. Harris's death. Specifically, he argues that the evidence shows that only Powell was involved in developing the plot to lure Mr. Harris to the Minota Avenue residence. But, a thorough review of the record, and particularly Ms. Kelly's testimony, directly belies this argument. Ms. Kelly testified that Reed was involved in the plot throughout the day as he drove the vehicle to transport Ms. Kelly and he told her that he would "take care of" the situation once Mr. Harris was led inside. Moreover, Ms. Kelly indicated that immediately after taking one step away from the stairwell into the basement, she saw Reed strike Mr. Harris's face with a pole. Indeed, Ms. Kelly testified that Mr. Harris had no opportunity to react or take any aggressive action toward Reed before Reed hit him. *See State v. Melchior*, 56 Ohio St.2d 15, 21-22 (1978) (determining that there was insufficient evidence for self-defense instruction where the defendant went to the murder victim's apartment to steal the victim's

money and stereo); *State v. Warner*, 9th Dist. Lorain No. 96CA006534, 2001 WL 1155698, *2 (Sept. 21, 2001) (determining that trial court did not err by failing to give self-defense instruction since the defendant was at fault in creating the violent situation where he disobeyed the order of a corrections officer). Consequently, we conclude Reed failed to offer sufficient evidence that he was not at fault for creating the violent situation. *See State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 WL 126973, *3 (Jan. 22, 2002) ("Ohio courts have long recognized that a person cannot provoke assault or voluntarily enter an encounter and then claim a right of self-defense.").

**{¶17}** Reed's second argument for the issuance of a self-defense instruction is that police recovered a gun with a bullet in the chamber from the basement that was within Mr. Harris's arm distance. Although the jurors could infer from this evidence that Mr. Harris had a gun on his person at the time of the incident, there is insufficient evidence to raise the possibility that Mr. Harris brandished the gun during a mutual combat scenario. Rather, both Mr. Harris's son and Ms. Kelly testified that they never saw Mr. Harris with a gun before he went into the basement, where he was immediately hit before he could react. And, the Medical Examiner indicated that Mr. Harris did not sustain any defensive wounds that suggested the occurrence of mutual combat. In light of this whole quantum of evidence, we cannot latch onto the mere recovery of a gun at the scene to determine that the trial court abused its discretion by denying the self-defense instruction. *Compare State v. Gillespie*, 172 Ohio App.3d 304, 2007-Ohio-3439, ¶ 19 (2d Dist.) (determining that trial court should have issued a self-defense jury instruction where the defendant testified that he saw the victim with a knife, did not hit the victim first, and fired his gun at the victim only after the victim came at him).

{¶18} In sum, the trial court did not abuse its discretion by denying Reed's request for a self-defense jury instruction. Accordingly, we overrule his third assignment of error.

## Assignment of Error I

**Mr. Reed's convictions were contrary to the manifest weight of the evidence.**

## Assignment of Error II

**The jury verdict finding Mr. Reed guilty of murder was against the sufficiency of the evidence.**

{¶19} In his first and second assignments of error, Reed challenges his conviction as unsupported by sufficient evidence and against the manifest weight of the evidence. We disagree.

### A. Standard of Review

{¶20} A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. After such an examination and taking the evidence in the light most favorable to the prosecution, we must decide whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* Although we conduct de novo review when considering a sufficiency of the evidence challenge, "we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." (Internal quotation and citation omitted.) *State v. Jarvis*, 9th Dist. Lorain No. 14CA010667, 2015-Ohio-4219, ¶ 10.

{¶21} A sufficiency challenge is legally distinct from a manifest weight challenge. *Thompkins* at 387. Accordingly, when applying the manifest weight standard, we are required to consider the whole record, "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson,* 9th Dist. Summit No. 26900, 2013–Ohio–5785, ¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction," *Thompkins* at 387.

{¶22} When applying these standards in this matter, we must consider the statutory elements necessary to sustain a murder conviction. R.C. 2903.02(A) relevantly provides that "[n]o person shall purposely cause the death of another[.]" "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

## B. Sufficiency Challenge

{¶23} Reed's first basis for his sufficiency challenge is that the jury initially returned a guilty verdict on murder and a not guilty verdict on involuntary manslaughter, which is a lesser-included offense of murder. Based on these initial verdict forms, Reed argues that "[i]f the jury found th[at ] Reed did not cause the death [of] the victim as was indicated in the [involuntary manslaughter] verdict form, it is unfathomable how he could have then purposely caused the

death of the victim." This argument relies on a faulty premise as to what the jury actually determined. When the trial court noticed that the jury initially returned verdicts on both the murder and involuntary manslaughter offenses, it instructed the jurors to go back to the deliberation room and to decide whether Reed was guilty of murder. If they unanimously found Reed guilty of murder, then they were to leave the verdict form for involuntary manslaughter blank. The jury did exactly that and returned to the courtroom with a verdict form stating that they found Reed guilty of murder and leaving blank the verdict form for involuntary manslaughter. As a result, the jury did not issue a verdict regarding the involuntary manslaughter offense and Reed has failed to carry his burden to demonstrate error. *See* App.R. 16(A)(7).

{¶24} Reed also challenges the sufficiency of the evidence for his conviction on the basis that there is "conflicting evidence and testimony." However, we are precluded from considering conflicting evidence or issues of credibility when engaging in a sufficiency analysis. *See Jarvis*, 2015-Ohio-4219, at ¶ 10. As a result, we likewise reject this basis for Reed's sufficiency challenge.

### C. Manifest Weight Challenge

{¶25} Reed's manifest weight challenge appears to rest on two grounds: (1) that the weight of the evidence cuts against a finding that he was involved in the plot to lure Mr. Harris to the Minota Avenue residence, which indicates that he did not plan to kill Mr. Harris; and (2) that the weight of the evidence supports a finding that Reed acted in self-defense. We reject both of these arguments.

{¶26} Ms. Kelly testified extensively to Reed's involvement in the plot to lure Mr. Harris to the Minota Avenue residence. Although Powell, Ms. Kelly's friend, was the person

who contacted her regarding the plot, Reed was involved throughout the day as the plan progressed. He drove the vehicle to pick Ms. Kelly up and he took her to Mr. Harris's house to first set up the meeting regarding the car sale. Reed told Ms. Kelly that he would handle the situation once Mr. Harris was lured inside of the residence. Reed drove Powell and Ms. Kelly to the Minota Avenue residence and stayed in the garage with them as they waited for Mr. Harris to arrive. The evidence overwhelmingly supports a finding that Reed was involved in the plot to lure Mr. Harris to the Minota Avenue residence and that he was even in charge of how to handle Mr. Harris once he reached the inside of the house.

**{¶27}** As to Reed's self-defense argument for his manifest weight claim, we note that in our resolution of the third assignment of error, we concluded that there was insufficient evidence to even support the issuance of a jury instruction on this point. While there was evidence that allowed an inference that Mr. Harris had a gun on his person, there was no evidence offered to indicate that he brandished the gun or that he engaged in mutual combat with Reed. Consequently, we conclude that Reed's conviction is not against the manifest weight of the evidence.

**{¶28}** Accordingly, we overrule Reed's first and second assignments of error.

### Assignment of Error IV

**The trial court's errors, when taken in their entirety, deprived Mr. Reed of a fair trial as guaranteed by the Fourteenth Amendment of the United States Constitution and Article I, Section Sixteen of the Ohio Constitution.**

**{¶29}** In his fourth assignment of error, Reed argues that the cumulative effects of the errors in his trial deprived him of a fair trial. However, as indicated in our resolution of the previous three assignments of error, Reed has not identified a single instance of error. Thus, the cumulative error doctrine does not apply here and does not support the reversal of Reed's

conviction. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132 ("[T]he doctrine of cumulative error is not applicable to the present case, because there were no multiple errors."). Accordingly, we overrule Reed's fourth assignment of error.

III.

**{¶30}** Having overruled all of Reed's assignments of error, we affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CARR, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.