[Cite as *State v. Crowe*, 2019-Ohio-3986.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO.  1-19-12

      v.

DALTON K. CROWE,               O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2018 0144

Judgment Affirmed

Date of Decision:   September 30, 2019

APPEARANCES:

    *Reed D. Searcy*  for Appellant

    *Jana E. Emerick* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Dalton K. Crowe ("Crowe"), appeals the February 27, 2019 judgment of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On April 3, 2018, Joshua McPheron ("Joshua") was living with his brother, Jonathan McPheron ("Jonathan"), at 207 West Grand Avenue in Lima, Ohio. (Jan. 8-9, 2019 Tr., Vol. I, at 166-167). Although Joshua had been sober for approximately seven months, he came home that day with a bottle of alcohol knowing "he was going to relapse and have a drink * * *." (*Id.* at 167-168). When Joshua arrived home, he saw that Crowe, who was a friend of Jonathan's, was sitting next to Jonathan on the couch. (*Id.* at 168). Joshua informed Jonathan and Crowe that he "wanted to be left alone that day" and withdrew to his basement bedroom where he "[s]tarted having some drinks." (*Id.* at 168-169).

{¶3} After spending some time drinking alcohol in the basement by himself, Joshua invited his friend, Angie Jordan ("Jordan"), to "hang out." (*Id.* at 169); (Jan. 8-9, 2019 Tr., Vol. II, at 231). Once Jordan arrived, Joshua and Jordan listened to music, talked, and started "taking some drinks." (Jan. 8-9, 2019 Tr., Vol. I, at 170). Eventually, Jordan came upstairs and asked Crowe whether he wanted to join her and Joshua. (Jan. 8-9, 2019 Tr., Vol. II, at 232). Crowe accepted Jordan's offer, followed her into the basement, and began imbibing Joshua's alcohol. (*Id.*); (Jan.

8-9, 2019 Tr., Vol. I, at 170). According to Jordan, she and Joshua became drunk, but Crowe was just "buzzed [be]cause he only had a little bit." (Jan. 8-9, 2019 Tr., Vol. II, at 245).

{¶4} At some point, Jordan began giving Joshua a haircut. (*Id.* at 234); (State's Exs. 27, 28). Joshua and Jordan decided to broadcast video of Joshua's haircut via Facebook Live using Joshua's cell phone, which Joshua held in his hand, and Jordan's cell phone, which Crowe held. (Jan. 8-9, 2019 Tr., Vol. II, at 234-235); (*See* State's Exs. 27, 28). In the videos, Joshua and Crowe can be heard arguing and trading insults. (*See* State's Exs. 27, 28). Initially, Joshua and Crowe's interaction was mostly "friendly," and the two were "joking," "laughing," and "playing." (Jan. 8-9, 2019 Tr., Vol. I, at 181); (Jan. 8-9, 2019 Tr., Vol. II, at 236); (*See* State's Exs. 27, 28). However, "playing went to arguing," the encounter soon "escalated," and a physical altercation ensued in which Crowe "backhanded" Joshua and Joshua struck Crowe in the face and knocked him to the ground. (Jan. 8-9, 2019 Tr., Vol. I, at 172-173, 182-183); (Jan. 8-9, 2019 Tr., Vol. II, at 236-238, 247); (State's Exs. 27, 28). Once the scuffle ended, Crowe mounted the staircase leading out of the basement. (State's Ex. 27). There, Crowe continued to scream threats and obscenities at Joshua. (*Id.*). Joshua responded by taunting Crowe until Crowe turned and climbed the stairs with Jordan following closely behind him. (*Id.*).

-3-

Joshua did not try to prevent Crowe from climbing the stairs, and he remained in the basement for approximately fifteen seconds after Crowe went upstairs. (*Id.*).

{¶5} When Crowe scaled the staircase to the main level of the residence, Jonathan, who had been napping upstairs, was awoken by Crowe's shouting. (Jan. 8-9, 2019 Tr., Vol. II, at 256-257). As Crowe walked through the living room past Jonathan, Jonathan noticed that Crowe was carrying a steak knife in his hand. (*Id.* at 258). According to Jonathan, Crowe "went to the front door and * * * pac[ed], like he was waiting for someone maybe, or maybe he was trying to leave, or wanted to leave but wasn't sure he wanted to." (*Id.* at 259). By then, Joshua had emerged from the basement and joined Crowe, Jonathan, and Jordan in the front room. (*Id.* at 239, 259); (State's Ex. 27). After arguing with Crowe for a few seconds, and before Jonathan could attempt to disarm Crowe, Joshua "head[ed] towards the front door and bl[ew] right past" Jonathan and Jordan. (Jan. 8-9, 2019 Tr., Vol. II, at 239, 259); (*See* State's Ex. 27). As Joshua moved toward the front door, Crowe began walking toward Joshua with his "guard up." (Jan. 8-9, 2019 Tr., Vol. II, at 261). Ultimately, Crowe and Joshua "met like right there in the front room * * * coming at each other" and began fighting again. (*Id.* at 261-262).

{¶6} A few seconds later, Jonathan moved to separate Joshua and Crowe. (State's Ex. 27). By this time, Crowe had "backed himself up" against a wall and Joshua was delivering punches to Crowe's face. (Jan. 8-9, 2019 Tr., Vol. II, at 252);

(State's Ex. 27). While separating Joshua and Crowe, Jonathan wrested the knife from Crowe "because [he] was actually trying to shove it in farther" into Joshua's chest. (Jan. 8-9, 2019 Tr., Vol. II, at 262); (*See* State's Ex. 27). Once Joshua and Crowe were separated, Crowe left the front room and moved toward the back of the residence. (*See* State's Ex. 27). At that time, Jonathan and Jordan realized that Joshua was bleeding profusely and that Crowe was gone. (Jan. 8-9, 2019 Tr., Vol. II, at 240, 263); (*See* State's Ex. 27). Joshua was transported to a local hospital where he received treatment for puncture wounds to his chest and left bicep and a slash wound to his neck. (Jan. 8-9, 2019 Tr., Vol. I, at 148, 176); (*See* State's Exs. 1, 2, 3, 4).

**{¶7}** Crowe was apprehended by law enforcement officers shortly after fleeing from 207 West Grand Avenue. (*See* Jan. 8-9, 2019 Tr., Vol. I, at 208-210, 216-217). When he was placed under arrest, law enforcement officers noticed that he "had blood smeared on his person," though they did not note any active bleeding. (*Id.* at 210-211, 217); (*See* State's Exs. 30, 33, 34). Despite the blood visible on his face and arms, when Crowe was taken to the hospital for treatment, his only apparent injuries were a swollen, bruised left eye and a small cut on one of his fingers. (Jan. 8-9, 2019 Tr., Vol. I, at 223); (Jan. 8-9, 2019 Tr., Vol. II, at 292-293); (State's Exs. 30, 31, 35, 36).

{¶8} On April 4, 2018, the day after the incident, Crowe was interviewed by Detective Steven Stechschulte ("Detective Stechschulte") of the Lima Police Department. (*See* State's Ex. 37). At various points in the interview, Crowe admitted that he used a knife against Joshua during the fight, but Crowe insisted that he was the victim in the altercation. (*Id.*). When asked why he grabbed the knife instead of leaving the residence, Crowe remarked that he was "very scared," "distraught," and disoriented. (*Id.*). Crowe stated that he armed himself with the knife because he perceived that Joshua was pursuing him closely as he left the basement. (*Id.*). However, he eventually conceded that he "should have left as soon as [the basement fight] happened" and that he should have "kept running" out of the residence after leaving the basement. (*Id.*). Throughout the interview, Crowe resisted characterizing his state of mind as angry or "pissed" at the time he confronted Joshua with the knife. (*Id.*).

{¶9} On May 17, 2018, the Allen County Grand Jury indicted Crowe on one count of felonious assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), a second-degree felony. (Doc. No. 4). On May 25, 2018, Crowe appeared for arraignment and pleaded not guilty to the count of the indictment. (Doc. No. 11).

{¶10} A jury trial was held on January 8 and 9, 2019. (Doc. Nos. 29, 77); (Jan. 8-9, 2019 Tr., Vol. I, at 1); (Jan. 8-9, 2019 Tr., Vol. II, at 230). At the close of the evidence, Crowe requested a self-defense jury instruction, which the trial

court declined to issue. (Jan. 8-9, 2019 Tr., Vol. II, at 319-320). However, the trial court granted Crowe's request for an aggravated-assault jury instruction and charged the jury to consider whether Crowe committed the inferior offense of aggravated assault rather than felonious assault. (*Id.* at 320, 367-368). After deliberations, the jury found Crowe guilty of felonious assault as charged in the indictment. (*Id.* at 379-380); (Doc. No. 77). The trial court filed its judgment entry of conviction on January 10, 2019. (Doc. No. 78).

{¶11} On February 27, 2019, the trial court sentenced Crowe to three years in prison. (Doc. No. 86).

{¶12} On March 25, 2019, Crowe filed a notice of appeal. (Doc. No. 91). He raises two assignments of error for our review.

**Assignment of Error No. I**

**The trial court erred and abused its discretion by failing to give a jury instruction on self-defense.**

{¶13} In his first assignment of error, Crowe argues that the trial court abused its discretion by failing to issue a self-defense jury instruction. Crowe argues that "sufficient evidence was presented to merit an instruction on the affirmative defense of self-defense" and that the trial court thus abused its discretion by declining to give the instruction. (Appellant's Brief at 6-10).

{¶14} "'Generally, a trial court must provide the jury with all instructions that are relevant and necessary to weigh the evidence and discharge their duties as

the fact finders.'" *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 38, quoting *State v. Sunderman*, 5th Dist. Stark No. 2006-CA-00321, 2008-Ohio-3465, ¶ 21, citing *State v. Joy*, 74 Ohio St.3d 178, 181 (1995); *State v. Thiel*, 3d Dist. Wyandot No. 16-16-01, 2017-Ohio-242, ¶ 135 ("[T]he trial court should give requested jury instructions 'if they are correct statements of the law applicable to the facts in the case * * *.'"), quoting *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). "However, 'a court need not instruct the jury as a party requests if "the evidence adduced at trial is legally insufficient" to support it.'" *Suffel* at ¶ 38, quoting *State v. Juntunen*, 10th Dist. Franklin Nos. 09AP-1108 and 09AP-1109, 2010-Ohio-5625, ¶ 13, quoting *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist.1993). *See State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, ¶ 72 ("[I]n order for a defendant to properly raise an affirmative defense, '"evidence of a nature and quality sufficient to raise the issue must be introduced, from whatever source the evidence may come."'"), quoting *State v. Melchior*, 56 Ohio St.2d 15, 20 (1978), quoting *State v. Robinson*, 47 Ohio St.2d 103, 111-112 (1976). Ultimately, "'[t]he trial court possesses the discretion "to determine whether the evidence presented at trial is sufficient to require that [the] instruction be given."'" *Suffel* at ¶ 38, quoting *Juntunen* at ¶ 13, quoting *State v. Lessin*, 67 Ohio St.3d 487, 494 (1993); *Fulmer* at ¶ 72. Accordingly, "'[w]hen reviewing a court's refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal to give said

instruction was an abuse of discretion under the facts and circumstances of the case.'" *State v. Simonis*, 3d Dist. Seneca No. 13-14-05, 2014-Ohio-5091, ¶ 31, quoting *State v. Kunz*, 6th Dist. Wood No. WD-10-047, 2011-Ohio-3115, ¶ 30, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

**{¶15}** In this case, the trial court declined Crowe's request for a self-defense jury instruction. Under the law in effect at the time of Crowe's trial, Crowe would have borne the burden of proving self-defense by a preponderance of the evidence. *State v. Ferdinandsen*, 3d Dist. Hancock No. 5-16-08, 2016-Ohio-7172, ¶ 22 ("As an affirmative defense, the defendant must prove by a preponderance of the evidence the elements of self-defense."), citing *State v. Reed*, 9th Dist. Summit No. 27755, 2016-Ohio-5123, ¶ 15, citing *State v. Cornwell*, 9th Dist. Wayne No. 14AP0017, 2015-Ohio-4617, ¶ 19, citing R.C. 2901.05(A) (Sept. 9, 2008).[1] The elements of a self-defense claim differ based on whether the defendant employed deadly or non-deadly force to defend against their perceived assailant. Crowe's use

---

[1] Subsequent to Crowe's trial, amendments to R.C. 2901.05 affecting the burden of proof for self-defense claims became effective. Under the current version of R.C. 2901.05, the "burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense *other than self-defense* * * * is upon the accused." (Emphasis added.) R.C. 2901.05(A) (Mar. 28, 2019). Now, "[i]f, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense * * *, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *." R.C. 2901.05(B)(1) (Mar. 28, 2019).

of a steak knife to slash at and stab Joshua constitutes the use of deadly force. *State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, ¶ 15, citing *State v. Densmore*, 3d Dist. Henry No. 7-08-04, 2009-Ohio-6870, ¶ 28, *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005-Ohio-5846, ¶ 17, and *State v. Hansen*, 4th Dist. Athens No. 01CA15, 2002-Ohio-6135, ¶ 29; R.C. 2901.01(A)(2) ("'Deadly force' means any force that carries a substantial risk that it will proximately result in the death of any person.").

{¶16} To establish self-defense through the use of deadly force, Crowe would have been required to prove: (1) that he "was not at fault in creating the situation giving rise to the affray"; (2) that he had "a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force"; and (3) that he "did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. Furthermore, a person is privileged only to "use as much force as is reasonably necessary to repel [an] attack." *State v. Shine-Johnson*, 10th Dist. Franklin No. 17AP-194, 2018-Ohio-3347, ¶ 61, citing *State v. Harrison*, 10th Dist. Franklin No. 06AP-827, 2007-Ohio-2872, ¶ 25, citing *State v. Jackson*, 22 Ohio St.3d 281 (1986). As a result, Crowe would have been required to show that "'the degree of force used was "warranted" under the circumstances and "proportionate" to the perceived

threat.'" *State v. Waller*, 4th Dist. Scioto Nos. 15CA3683 and 15CA3684, 2016-Ohio-3077, ¶ 26, quoting *State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 31, citing *State v. Palmer*, 80 Ohio St.3d 543, 564 (1997). "'[T]he elements of self-defense are cumulative.'" *Harding* at ¶ 16, quoting *Jackson* at 284. Therefore, had the jury been instructed on self-defense, Crowe's failure to prove "'*any one* of these elements by a preponderance of the evidence'" would have doomed his claim of self-defense. (Emphasis sic.) *Id.*, quoting *Jackson* at 284.

**{¶17}** In rejecting Crowe's request for a self-defense instruction, the trial court concluded, "[I]f you construe [the evidence] in favor of [Crowe] there's no evidence that [Crowe] did not have both the ability and the opportunity to leave. So, * * * as a matter of law, [Crowe] violated a duty to retreat. He had the opportunity to retreat [and] [t]herefore, the instruction on self-defense would not apply in this case." (Jan. 8-9, 2019 Tr., Vol. II, at 319). Furthermore, the trial court refused to issue the self-defense jury instruction on the basis that "the evidence is that [Joshua] was stabbed at least four times and * * * that exceeded that which is conceivably necessary to repel the attack." (*Id.* at 319-320). After reviewing the record, we conclude that the trial court did not abuse its discretion by determining that the evidence was insufficient to support a self-defense jury instruction. Specifically, we agree with the trial court's conclusion that the evidence was insufficient to demonstrate that Crowe did not violate his duty to retreat. Thus, we

conclude that the trial court did not abuse its discretion by denying Crowe's request for a self-defense instruction.

{¶18} After the initial physical confrontation in the basement, Crowe had the opportunity to leave the residence without further incident. The evidence demonstrated that Crowe was able to make his way to the staircase leading out of the basement with little difficulty, and neither Joshua nor Jordan blocked Crowe's path to the stairs or attempted to stop him from returning to the main level of the residence. Moreover, there was no evidence presented indicating that Crowe was prevented from leaving the residence once he exited the basement. The evidence established that Crowe chose to remain in the residence, knife in hand, rather than take advantage of the opportunity to leave.

{¶19} In addition, the evidence demonstrated that after leaving the basement and grabbing the knife, Crowe positioned himself in the front room near the front door. Crowe was still pacing by the front door when Joshua emerged from the basement and resumed arguing with Crowe roughly 25 seconds later. Yet, as Joshua crossed the front room to confront Crowe again, Crowe moved toward Joshua and met him in the middle of the room instead of attempting to escape through the front door. Approximately 5 seconds elapsed between when Joshua started to approach Crowe and when the second physical confrontation began. (State's Ex. 27). Thus, while Crowe was likely aware that Joshua intended to fight him again and although

he had time to distance himself from Joshua, Crowe decided to move toward, rather than away from, the danger posed by Joshua. (*See* State's Ex. 27); (Jonathan's Testimony, Jan. 8-9, 2019 Tr., Vol. II, at 262) ("They both knew something was going to happen * * *[.] Like, they were going to fight. They knew it."). Accordingly, we conclude that the trial court did not abuse its discretion by determining that the evidence was legally insufficient to support a determination that Crowe did not violate his duty to retreat. *See Harding*, 2011-Ohio-2823, at ¶ 17-36 (where the defendant knew that his assailants intended to fight him, was not surrounded on a public sidewalk, and used the time it took his assailants to approach him to prepare for, rather than flee from, the fight, the weight of the evidence supported that the defendant violated his duty to retreat); *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 43-44; *State v. Mathews*, 3d Dist. Logan No. 8-02-19, 2002-Ohio-6619, ¶ 6-8. As a result, we conclude that the trial court did not abuse its discretion by refusing Crowe's request for a self-defense jury instruction.[2]

{¶20} Crowe's first assignment of error is overruled.

---

[2] Because we have concluded that the trial court did not abuse its discretion by declining to issue a self-defense jury instruction on grounds that the evidence was legally insufficient to demonstrate that Crowe did not violate his duty to retreat, we need not consider the trial court's alternative justification for declining to issue a self-defense instruction—that the force used by Crowe was manifestly disproportionate to the perceived threat.

**Assignment of Error No. II**

**The jury's decision finding appellant guilty of felonious assault was against the manifest weight of the evidence.**

{¶21} In his second assignment of error, Crowe argues that his felonious-assault conviction is against the manifest weight of the evidence. Specifically, Crowe argues that the weight of the evidence supports that he was seriously provoked by Joshua and that he attacked Joshua with the steak knife in a sudden fit of rage. (*See* Appellant's Brief at 12-13). Thus, Crowe argues, the evidence supports a conviction for aggravated assault, rather than felonious assault. (*Id.* at 12-13).

{¶22} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs

heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶23} The offense of felonious assault is codified in R.C. 2903.11, which provides in relevant part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *." R.C. 2903.11(A)(2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "Deadly weapon" means "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).

{¶24} The offense of aggravated assault is codified in R.C. 2903.12. R.C. 2903.12 provides in pertinent part:

> No person, while under the influence of sudden passion or in a sudden
> fit of rage, either of which is brought on by serious provocation
> occasioned by the victim that is reasonably sufficient to incite the
> person into using deadly force, shall knowingly * * * [c]ause or

attempt to cause physical harm to another * * * by means of a deadly weapon * * *.

R.C. 2903.12(A)(2). Thus, "aggravated assault is an inferior degree [offense to] felonious assault because its elements are identical to or contained within the offense of felonious assault, coupled with the additional presence of one or both mitigating circumstances of sudden passion or a sudden fit of rage brought on by serious provocation occasioned by the victim." *State v. Johns*, 10th Dist. Franklin No. 11AP-203, 2011-Ohio-6823, ¶ 20, citing *State v. Logan*, 10th Dist. Franklin No. 08AP-881, 2009-Ohio-2899, ¶ 12, fn. 1, citing *State v. Deem*, 40 Ohio St.3d 205 (1988). The defendant bears the burden of proving the mitigating circumstances by a preponderance of the evidence. *Id.*, citing *State v. Rhodes*, 63 Ohio St.3d 613 (1992), syllabus.

{¶25} "The serious-provocation inquiry is a factual inquiry that contains 'both objective and subjective components.'" *State v. Smith*, 168 Ohio App.3d 141, 2006-Ohio-3720, ¶ 46 (1st Dist.), quoting *State v. Shane*, 63 Ohio St.3d 630, 634 (1992). First, under the objective component, the trier of fact must determine whether the provocation was "reasonably sufficient to bring on extreme stress and * * * reasonably sufficient to incite or to arouse the defendant into using deadly force." *Deem* at paragraph five of the syllabus, citing *State v. Mabry*, 5 Ohio App.3d 13 (8th Dist.1982), paragraph five of the syllabus. In other words, the trier of fact

must decide whether the defendant has proven that the provocation was "'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" *State v. Saldana*, 3d Dist. Wyandot No. 16-08-09, 2008-Ohio-5829, ¶ 12, quoting *Shane* at 635.

{¶26} Next, if the trier of fact has found that the defendant satisfied his burden under the objective component, "the inquiry shifts to the subjective component of whether [the defendant], in [a] particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Shane* at 634. At that point, the trier of fact must consider the "'emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * *.'" *Id.*, quoting *Deem* at paragraph five of the syllabus.

{¶27} In this case, the evidence overwhelmingly demonstrates that Crowe knowingly caused Joshua physical harm by means of a deadly weapon. As evidenced by one of the Facebook Live videos, uncontradicted testimony, and Crowe's own admission during his interview with Detective Stechschulte, Crowe slashed and stabbed at Joshua with a deadly weapon, a steak knife, during their second physical confrontation. *See State v. Brown*, 8th Dist. Cuyahoga No. 87651, 2006-Ohio-6267, ¶ 42 ("Ohio courts * * * have held that a steak knife can constitute a deadly weapon."), citing *In re J.R.*, 9th Dist. Medina No. 04CA0066-M, 2005-Ohio-4090, *State v. Burrows*, 8th Dist. Cuyahoga No. 54153, 1988 WL 12981 (Feb.

11, 1988), and *State v. Knecht*, 11th Dist. Portage No. 1306, 1983 WL 6026 (Dec. 16, 1983). As a result, Joshua sustained a number of slash wounds and puncture wounds to his arm, chest, and neck—injuries that unquestionably fit within the definition of physical harm. Finally, from the evidence in the record, especially Crowe's interview with Detective Stechschulte, it can be readily inferred that Crowe knew that by attacking Joshua with the steak knife, he would probably cause physical harm to Joshua. Therefore, absent a showing by Crowe by a preponderance of the evidence that Joshua seriously provoked him and that he attacked Joshua with the steak knife under the influence of a sudden passion or fit of rage occasioned by Joshua's serious provocation, Crowe's felonious-assault conviction is not against the manifest weight of the evidence.

{¶28} Here, even assuming that Crowe satisfied his burden of proving by a preponderance of the evidence that Joshua's aggression was reasonably sufficient to incite him into using deadly force against Joshua, the evidence does not support that Crowe was actually under the influence of a sudden passion or in a sudden fit of rage when he used the steak knife against Joshua. "When analyzing the subjective prong of the [serious-provocation] test, '[e]vidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.'" *Harding*, 2011-Ohio-2823, at ¶ 43, quoting *State v. Stewart*, 10th Dist. Franklin No. 10AP-526, 2011-Ohio-466, ¶

13, citing *State v. Tantarelli*, 10th Dist. Franklin No. 94APA11-1618, 1995 WL 318730 (May 23, 1995), and citing *State v. Mack*, 82 Ohio St.3d 198, 201 (1998) and *State v. McClendon*, 2d Dist. Montgomery No. 23558, 2010-Ohio-4757, ¶ 23, *vacated, in part, on other grounds*, *State v. McClendon*, 128 Ohio St.3d 354, 2011-Ohio-954. While there is little direct evidence in the record concerning Crowe's state of mind at the time of the attack, what direct evidence there is supports that Crowe was acting out of fear, rather than passion or rage, when he attacked Joshua.

**{¶29}** In his interview with Detective Stechschulte, Crowe repeatedly claimed that he was "very scared" or "distraught" when he picked up the steak knife and used it against Joshua. (*See* State's Ex. 37). Furthermore, throughout the interview, Crowe was reluctant to describe his state of mind as "pissed" or angry. (*See id.*). Therefore, although we previously concluded that the trial court did not abuse its discretion by refusing to instruct the jury on self-defense, the record supports that Crowe's mental state at the time of the incident was more consistent with the fear of imminent death or great bodily harm necessary to sustain a claim of self-defense through the use of deadly force than with a sudden passion or a fit of rage. *See Harding* at ¶ 44-47. In sum, the evidence weighs against a finding that Crowe attacked Joshua with the steak knife while under the influence of a sudden passion or fit of rage caused by Joshua's serious provocation, and accordingly,

Crowe's felonious-assault conviction is not against the manifest weight of the evidence.

{¶30} Crowe's second assignment of error is overruled.

{¶31} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**