[Cite as *State v. Estelle*, 2021-Ohio-2636.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 1-20-50

    v.

QUINTEL L. ESTELLE,

                                    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2019 0217

Judgment Affirmed

Date of Decision: August 2, 2021

APPEARANCES:

    *Laurel A. Kendall* for Appellant

    *Jana E. Emerick* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Quintel L. Estelle, appeals the October 5, 2020 judgment of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶2} On May 4, 2019, Estelle and his stepson, A.H., were at Estelle's house in Lima, Ohio when they got into an argument over A.H.'s refusal to wash dishes. The argument became physical. A.H. testified that Estelle "grabbed [him] and [they] tussl[ed] and then [he] slipped and fell and [Estelle] * * * got on top of [him] and put his forearm on [his] jaw." (Aug. 25-27, 2020 Tr. at 160). Estelle testified that he merely "secured [A.H.'s] person" in an effort to prevent A.H. from leaving the house, and while he stated that he and A.H. fell to the ground, he denied placing his forearm across A.H.'s jaw. (Aug. 25-27, 2020 Tr. at 493-494). Regardless, when the physical altercation ended, A.H. was incensed. A.H. placed a phone call to Donald Smith, whom A.H. regarded as his father, to tell Smith that Estelle had "put his hands on [him] again." (Aug. 25-27, 2020 Tr. at 163).

{¶3} Within minutes, Smith arrived and parked his vehicle in the street in front of Estelle's house. By the time Smith arrived, a small group of people had gathered in front of Estelle's house. In addition to Estelle and A.H., this group included Latavia Estelle, who is Estelle's wife and A.H.'s mother. As Latavia was

attempting to deescalate the conflict between Estelle and A.H., Smith exited his vehicle and strode across the front yard toward Estelle. Estelle and Smith exchanged a few words as Smith approached. When Smith reached Estelle, Smith punched Estelle once in the face. The force of the punch caused Estelle, who was standing either on the bottommost of the steps leading up to his covered front porch or just in front of the steps, to fall backward onto the steps. After stumbling backward, Estelle stood up immediately, mounted the steps, and ran into his house. Meanwhile, Smith proceeded back toward his vehicle. When Smith reached his vehicle, he and Latavia began arguing. Smith then called 911 to request the assistance of law enforcement officers. While Smith was on the phone with the 911 operator, he stood in the street near the open front driver's side door of his vehicle.

{¶4} After Estelle retreated into his house, Estelle remained there for anywhere from "a minute, a minute and a half, half a minute" up to "at least two/three minutes." (Aug. 25-27, 2020 Tr. at 315, 467). When Estelle eventually emerged from his house, he was armed with a handgun. According to Estelle, he retrieved the handgun from his bedroom because he "was frightened after [Smith] had punched [him] and [Smith] was arguing with [Latavia] still outside." (Aug. 25-27, 2020 Tr. at 512).

{¶5} After exiting his house, Estelle descended the front porch steps and walked across the front yard toward Smith, who was still standing in the street near

his vehicle talking to the 911 operator. Estelle claimed it was not his intention to hurt Smith and that he "just was trying to scare him to let him know, 'you need to just leave so this don't need to go any further.'" (Aug. 25-27, 2020 Tr. at 502). Estelle stated that when he reached the "tree lawn," the strip of grass between the public sidewalk and the street, he observed Smith duck behind his vehicle. Estelle testified that he "really panicked" when Smith ducked because he feared that Smith might be retrieving a gun. (Aug. 25-27, 2020 Tr. at 502). However, Smith did not have a gun, and no other witness testified to seeing Smith duck behind his vehicle.

{¶6} According to Estelle, after Smith "rose up" from behind his vehicle, he fired a shot at Smith. (Aug. 25-27, 2020 Tr. at 502). The bullet struck Smith. Estelle testified that after he fired the first shot at Smith, Smith "stumbled towards * * * around the door area," which caused Estelle to "fire[] a second shot because [he] thought [Smith] was * * * still raising up or something." (Aug. 25-27, 2020 Tr. at 503). The second bullet also struck Smith. While Estelle insisted that he fired the second shot from approximately the same position on the tree lawn that he occupied when he fired the first shot, other witnesses testified that after firing the first shot, Estelle left the tree lawn, walked into the street, circled around the front of Smith's vehicle, and stood over Smith as he shot him again. In addition, some witnesses recalled Estelle telling Smith something to the effect of, "I bet you won't

put your fucking hands on me again," when he shot Smith for the second time. (Aug. 25-27, 2020 Tr. at 295, 317).

{¶7} Law enforcement officers were already en route to Estelle's house in response to Smith's 911 call. Once they arrived, the responding officers administered CPR until paramedics arrived. Unfortunately, efforts to save Smith proved unsuccessful, and Smith died just before 10:00 p.m. Estelle, who fled the scene of the shooting before the responding officers arrived, remained at large for six days until he turned himself in to the Lima Police Department.

{¶8} On June 13, 2019, the Allen County Grand Jury indicted Estelle on one count of purposeful murder in violation of R.C. 2903.02(A), an unclassified felony, and on one count of felony murder, with the predicate offense of felonious assault, in violation of R.C. 2903.02(B), an unclassified felony. Both of the counts in the indictment contained a three-year firearm specification pursuant to R.C. 2941.145(A). On June 20, 2019, Estelle appeared for arraignment and pleaded not guilty to the counts and specifications contained in the indictment.

{¶9} A jury trial was held on August 25-27, 2020. At the close of the evidence, Estelle requested the jury be instructed on the presumption of self-defense set forth in R.C. 2901.05(B)(2). The trial court denied Estelle's request. Estelle then asked that the jury be instructed on self-defense generally or, alternatively, that the jury be instructed on the inferior-degree offense of voluntary manslaughter. The

trial court denied these requests as well. On August 27, 2020, the jury found Estelle guilty of all counts and specifications charged in the indictment.

{¶10} The sentencing hearing was held on October 5, 2020. At the sentencing hearing, the trial court determined the two counts of murder merged for purposes of sentencing. The State elected to have the trial court sentence Estelle for felony murder as well as for its associated firearm specification. The trial court sentenced Estelle to a mandatory term of 15 years to life in prison for his felony-murder conviction and a mandatory term of 3 years in prison for the accompanying firearm specification. The trial court ordered these sentences to be served consecutively for an aggregate term of 18 years to life in prison. The trial court filed its judgment entry of sentence on October 5, 2020.

{¶11} On October 29, 2020, Estelle timely filed a notice of appeal. He raises four assignments of error for our review.

## II. Assignments of Error

**1.    The trial court abused its discretion when it denied Appellant's request for a jury instruction on self-defense.**

**2.    In the alternative, the trial court abused its discretion when it refused Appellant's request for jury instruction on voluntary manslaughter as an inferior offense to purposeful murder.**

**3.    Appellant's conviction for purposeful murder was not supported by sufficient evidence of a specific intent to kill.**

**4.    Appellant's conviction for murder was against the manifest weight of the evidence as to the element of intent.**

We will address Estelle's assignments of error in the order presented, but for ease of discussion, we will consider Estelle's first and second assignments of error together. We will also consider Estelle's third and fourth assignments of error jointly.

### III. Discussion

**A.     First and Second Assignments of Error:  Did the trial court abuse its discretion when it refused to instruct the jury on self-defense or voluntary manslaughter?**

{¶12} In his first and second assignments of error, Estelle argues the trial court erred by declining to issue his requested jury instructions.  In his first assignment of error, Estelle maintains the trial court abused its discretion by refusing to instruct the jury on self-defense because the evidence presented at trial was sufficient to submit the issue of self-defense to the jury.  In making this argument, Estelle focuses particularly on where the confrontation with Smith occurred and how the location of the confrontation affected his right to defend himself against Smith.  Estelle contends that "because the initial confrontation occurred on the covered front porch of his house, which is arguably part of the residence pursuant to statute, and because the events herein were arguably one continuous event, * * * [he] had no duty to retreat because this event started in his residence."  According to Estelle, because the confrontation started in his residence and there was evidence supporting the other elements of self-defense, the jury should have been instructed

both on the presumption of self-defense set forth in R.C. 2901.05(B)(2) and on self-defense generally.[1]  In his second assignment of error, Estelle argues the trial court abused its discretion by refusing to instruct the jury on voluntary manslaughter because "a reasonable jury could have found that [he] was under the stress of a sudden passion of fear" when he shot Smith.

### i.  Standard of Review

{¶13} "Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder." *State v. Shine-Johnson*, 10th Dist. Franklin No. 17AP-194, 2018-Ohio-3347, ¶ 25.  "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240.  Yet, a trial court may refuse to issue a requested jury instruction if "'the evidence adduced at trial is legally insufficient' to support it." *State v. Juntunen*, 10th Dist. Franklin Nos. 09AP-1108

---

[1] In his appellate brief, Estelle suggests the evidence also supported that he was justified in using force to defend Latavia against Smith.  He thus claims the trial court also abused its discretion by failing to issue a jury instruction on defense of another.  Although Estelle specifically requested a self-defense jury instruction at trial, he did not request a defense of another jury instruction or object to its absence from the trial court's charge to the jury.  "If there was no formal objection and the record does not reveal a material dispute over the jury instructions, appellate review must be limited to plain error under Crim.R. 52(B)." *State v. Kiehl*, 11th Dist. Portage No. 2015-P-0020, 2016-Ohio-8543, ¶ 25.  *See State v. Koch*, 2d Dist. Montgomery No. 28000, 2019-Ohio-4099, ¶ 73-80 (conducting plain-error analysis where defendant did not request a jury instruction on defense of another).  While Estelle would not have been precluded from arguing plain error on appeal, he fails to assert such an argument, and "we decline to sua sponte fashion one and then address it." *State v. McCrae*, 9th Dist. Summit No. 27387, 2015-Ohio-1803, ¶ 8.

and 09AP-1109, 2010-Ohio-5625, ¶ 13, quoting *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist.1993). "[T]he trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction." *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, ¶ 72. Accordingly, "[a] court reviewing a trial court's refusal to submit to the jury a requested instruction must determine whether the trial court's decision constituted 'an abuse of discretion under the facts and circumstances of the case.'" *Juntunen* at ¶ 13, quoting *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

**ii. The trial court did not abuse its discretion by refusing to instruct the jury on the presumption of self-defense.**

{¶14} Estelle first argues the trial court abused its discretion by declining to instruct the jury on the presumption of self-defense set forth in R.C. 2901.05(B)(2).[2] Under R.C. 2901.05(B)(2),[3]

> a person is presumed to have acted in self-defense * * * when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used

---

[2] In past cases, courts routinely referred to former R.C. 2901.05(B)(1), which was identical to R.C. 2901.05(B)(2) in all material respects, as the "castle doctrine." *State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-Ohio-3126, ¶ 40; *State v. Hadley*, 3d Dist. Marion No. 9-11-30, 2013-Ohio-1942, ¶ 13.

[3] R.C. 2901.05 was amended subsequent to Estelle's trial. *See* R.C. 2901.05 (Apr. 6, 2021). However, the amendments did not alter R.C. 2901.05(B)(2) or either of the definitions contained in R.C. 2901.05(D)(2) and (3), introduced later in this paragraph. *Compare* R.C. 2901.05(B)(2), (D)(2) and (3) (Apr. 6, 2021) *with* R.C. 2901.05(B)(2), (D)(2) and (3) (Mar. 28, 2019).

> is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence * * * occupied by the person using the defensive force.

As used in R.C. 2901.05(B)(2), "residence" means "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest." R.C. 2901.05(D)(3). "Dwelling" is in turn defined as "a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. * * * [A] building or conveyance includes, but is not limited to, an attached porch * * *." R.C. 2901.05(D)(2). "Thus, in Ohio 'a person is presumed to have acted in self-defense,' and may use deadly force, 'when attempting to expel or expelling another from their home who is unlawfully present.'" *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 52, quoting *State v. Johnson*, 8th Dist. Cuyahoga No. 92310, 2010-Ohio-145, ¶ 18.

{¶15} Estelle acknowledges that Smith was standing in the street when the fatal shots were fired, but he nonetheless argues that he was entitled to a jury instruction on the presumption of self-defense because Smith initiated the confrontation near the front porch steps, a part of Estelle's residence as defined in R.C. 2901.05. However, Estelle's conception of the scope of R.C. 2901.05(B)(2) is far too expansive. R.C. 2901.05(B)(2) "clearly contemplates a scenario of a [home]

-10-

invasion—i.e., the person against whom the defensive force is used is in the process of unlawfully and without privilege entering (or has entered) the defendant's residence * * *." *State v. Nye*, 3d Dist. Seneca No. 13-13-05, 2013-Ohio-3783, ¶ 29. Under R.C. 2901.05(B)(2), the defendant is not entitled to a presumption of self-defense simply because the victim had previously entered or attempted to enter the defendant's residence. Instead, to be entitled to the presumption of self-defense under R.C. 2901.05(B)(2), the defendant must have used deadly force against an intruder *while* the intruder was inside of or attempting to enter the defendant's residence. The presumption of self-defense arises when the defendant uses deadly force while expelling or attempting to expel an intruder from the defendant's residence, but once the intruder has been completely and successfully expelled from the defendant's residence, the defendant cannot use deadly force against the erstwhile intruder and invoke the presumption of self-defense. The presumption of self-defense afforded by R.C. 2901.05(B)(2) does not permit a defendant to pursue an intruder out of the residence. *See State v. Montgomery*, 12th Dist. Clermont No. CA2015-03-028, 2015-Ohio-4652, ¶ 14 (noting that the presumption of self-defense set forth in R.C. 2901.05(B) is not a license to kill).

{¶16} In order for a defendant to receive the benefit of a jury instruction on the presumption contained in R.C. 2901.05(B)(2), the trial court must focus on the conduct and location of the victim at the time the defendant claims to be acting in

self-defense. Here, there was no evidence adduced at trial suggesting that Smith was inside of or attempting to enter Estelle's residence when Estelle shot Smith. It is undisputed that when Estelle fired the two shots, Smith was standing in the street near his vehicle. It has been held that because a person's driveway is not a dwelling under R.C. 2901.05(D)(2), it does not constitute a part of his residence. *State v. Moore*, 4th Dist. Lawrence No. 19CA13, 2020-Ohio-4321, ¶ 21, 28. Certainly, then, the public street running in front of Estelle's house cannot be considered Estelle's residence under any plausible interpretation of that term. Nor was any evidence presented indicating that Smith was walking back toward Estelle's residence in an attempt to enter the residence at the time that he was shot. Even if Estelle is correct that the confrontation began on the steps leading to the covered front porch, because the evidence demonstrated that Smith was not inside of or attempting to enter Estelle's residence when he was shot by Estelle, the trial court did not abuse its discretion by refusing to instruct the jury on the presumption of self-defense. *See Moore* at ¶ 28 (concluding that the presumption of self-defense did not apply because the victim was shot outside of the defendant's residence in the defendant's driveway); *Hubbard* at ¶ 55-56 (concluding that the defendant was not entitled to the presumption of self-defense because "[a]lthough defendant testified that people were in his yard, there was no evidence * * * that anyone was in the process of unlawfully entering onto defendant's porch when [he] shot his gun"); *State v.*

Case No. 1-20-50

*Darby*, 10th Dist. Franklin No. 10AP-416, 2011-Ohio-3816, ¶ 37-38 (holding that the defendant was not entitled to the presumption of self-defense where the victim was "neither in [the defendant's] residence, nor on the stoop, nor even at the base of the stairs leading to the stoop, nor climbing over the railing to the stoop," but was instead engaging in a verbal confrontation on the sidewalk outside the defendant's residence).

**iii. The trial court did not abuse its discretion by refusing to instruct the jury on self-defense.**

{¶17} Although we conclude the trial court did not abuse its discretion by refusing to instruct the jury on the presumption of self-defense set forth in R.C. 2901.05(B)(2), whether the trial court abused its discretion by completely refusing to issue a self-defense instruction is a separate question. To answer this question, we must consider R.C. 2901.05(A) and (B)(1), which pertain to the defendant's obligation to produce evidence supporting a claim of self-defense, the quantum of evidence necessary to submit the issue of self-defense to the jury, and the prosecution's ultimate responsibility for disproving the defendant's claim of self-defense.

{¶18} Under R.C. 2901.05(A) and (B)(1),

(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an

-13-

> affirmative defense other than self-defense * * * as described in division (B)(1) of this section, is upon the accused.
>
> (B)(1) A person is allowed to act in self-defense * * *. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense * * *, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

R.C. 2901.05(A), (B)(1) (Mar. 28, 2019).[4] Under R.C. 2901.05(A) and (B)(1), a defendant claiming self-defense has the burden of production—that is, the burden of producing evidence that "tends to support" his use of force in defending himself. *State v. Davidson-Dixon*, 8th Dist. Cuyahoga No. 109557, 2021-Ohio-1485, ¶ 18; *State v. Sturgill*, 12th Dist. Clermont No. CA2020-03-018, 2020-Ohio-6665, ¶ 17; *State v. Williams*, 1st Dist. Hamilton No. C-190380, 2020-Ohio-5245, ¶ 7-8; *State v. Petway*, 11th Dist. Lake No. 2019-L-124, 2020-Ohio-3848, ¶ 55. If the defendant produces evidence that "tends to support" that he used force in self-defense, "[t]he burden then shifts to the state under its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use the force in self-defense." *Davidson-Dixon* at ¶ 18.

---

[4] As discussed in footnote 3, above, R.C. 2901.05 was amended subsequent to Estelle's trial. In addition to one minor change in R.C. 2901.05(C), the word "presented" was inserted before the phrase "as described" in R.C. 2901.05(A). *Compare* R.C. 2901.05(A) (Apr. 6, 2021) *with* R.C. 2901.05(A) (Mar. 28, 2019). The amendments did not affect R.C. 2901.05(B)(1). *Compare* R.C. 2901.05(B)(1) (Apr. 6, 2021) *with* R.C. 2901.05(B)(1) (Mar. 28, 2019).

{¶19} To determine whether a defendant satisfied his burden of production, the court must consider whether the evidence, from whatever source it may come, "tends to support" the defendant's claim of self-defense. *See State v. Parrish*, 1st Dist. Hamilton No. C-190379, 2020-Ohio-4807, ¶ 14, citing *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus, and *State v. Robinson*, 47 Ohio St.2d 103, 111 (1976). Evidence "tends to support" the defendant's use of force in self-defense if it "'serve[s], contribute[s], or conduce[s] in some degree or way' to support that he used the force in self-defense * * *." *Petway* at ¶ 74, quoting TEND, *Black's Law Dictionary* (11th Ed.2019); *State v. Tolle*, 4th Dist. Adams No. 19CA1095, 2020-Ohio-935, ¶ 24. Stated differently, "evidence 'tends to support' that a defendant used force in self-defense, and a defendant is entitled to a jury instruction on the defense of self-defense under R.C. 2901.05 * * *, where the evidence in the record is sufficient to raise a question of reasonable doubt of guilt, based on a claim of self-defense, in the mind of a reasonable juror." *State v. Jacinto*, 8th Dist. Cuyahoga No. 108944, 2020-Ohio-3722, ¶ 49. "In deciding whether to give a self-defense instruction, the trial court must view the evidence in favor of the defendant, and the question of credibility is not to be considered." *Davidson-Dixon* at ¶ 20. Even so, "'[i]f the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the * * * defense, and submission of the issue to the jury will be unwarranted.'" *Tolle* at ¶ 23, quoting *Melchior* at 20.

{¶20} "The elements of a self-defense claim differ based on whether the defendant employed deadly or non-deadly force to defend against their perceived assailant." *State v. Crowe*, 3d Dist. Allen No. 1-19-12, 2019-Ohio-3986, ¶ 15. There is no doubt that Estelle employed deadly force by using a handgun to shoot Smith. *See State v. Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 15 ("The use of a gun constitutes the use of deadly force."); R.C. 2901.01(A)(2) (defining "deadly force" as "any force that carries a substantial risk that it will proximately result in the death of any person"). On the day of the shooting and at the time of Estelle's trial, a claim of self-defense by means of deadly force consisted of the following elements: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of deadly force; and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "Furthermore, a person is privileged only to 'use as much force as is reasonably necessary to repel [an] attack.'" *Crowe* at ¶ 16, quoting *Shine-Johnson*, 2018-Ohio-3347, at ¶ 61.

{¶21} R.C. 2901.09, as it existed on the day of the shooting and at the time of Estelle's trial, provided that "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense * * *." R.C. 2901.09(B)

(Sept. 9, 2008).[5]  "Residence," as used in the prior version of R.C. 2901.09, had "the same meaning[] as in [R.C. 2901.05]."  R.C. 2901.09(A) (Sept. 9, 2008).  Therefore, under the law as it existed during the time periods relevant to this case, there existed a general duty to retreat before using deadly force in self-defense, but a person was relieved of this duty if he was lawfully in his residence when he used deadly force to defend himself.

{¶22} Estelle notes that the trial court's refusal to issue a self-defense instruction was predicated on its determination that he had a duty to retreat before using deadly force against Smith.  Estelle maintains that the trial court's determination was in error because he should be considered to have been in his residence when he shot Smith, thus relieving him of any duty to retreat.

{¶23} Estelle is mistaken.  It is uncontroverted that when Estelle first shot Smith, Estelle was standing in the tree lawn between the public sidewalk and the street.  In addition, the evidence adduced at trial demonstrated that Estelle was standing either in the tree lawn or in the street when he fired the second shot at Smith.  In any event, Estelle was clearly not inside his residence when he fired the shots that killed Smith.  *See Moore*, 2020-Ohio-4321, at ¶ 21 (concluding that R.C.

---

[5] R.C. 2901.09 now provides that "[f]or purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be."  R.C. 2901.09(B) (Apr. 6, 2021).  Courts previously referred to the former version of R.C. 2901.09 as the "castle doctrine."  *Collins*, 2020-Ohio-3126, at ¶ 40.  The effect of the 2021 amendment to R.C. 2901.09, which is becoming more widely referred to as the "stand your ground doctrine," is to expand the "no duty to retreat" exception from the person's residence or vehicle to any place where the person is lawfully entitled to be.

2901.09 did not apply because the defendant voluntarily left his garage and shot the victim from the driveway, which was not part of the defendant's residence); *State v. Wallace-Lee*, 2d Dist. Greene No. 2019-CA-19, 2020-Ohio-3681, ¶ 30-31 (noting that courts have found that a defendant has a duty to retreat when "the confrontation (fight) occurred in the defendant's front yard," thereby suggesting a defendant's front yard is not part of his residence); *see also Moore* at ¶ 24 (collecting cases where "Ohio appellate courts held that there is a duty to retreat from one's driveway"). Moreover, even assuming that the confrontation began within Estelle's residence, because Estelle fired the fatal shots from without the confines of his residence, Estelle was not relieved of his duty to retreat. *See Shine-Johnson*, 2018-Ohio-3347, at ¶ 33 (concluding that the trial court did not abuse its discretion by declining to issue a "no duty to retreat" jury instruction where altercation began inside of the home but the defendant escaped to the yard, where he fired the fatal shot). Consequently, the trial court correctly concluded that Estelle was required to produce evidence tending to show that he did not violate his duty to retreat before the issue of self-defense could be submitted to the jury.

{¶24} Based on our review of the record, we conclude that the trial court did not abuse its discretion when it determined that the evidence presented at trial did not tend to show that Estelle complied with his duty to retreat before using deadly force against Smith. The evidence presented at trial established that after Smith

punched Estelle, Estelle safely withdrew into his residence. There was no evidence Smith tried to prevent Estelle from retreating into his residence or that Smith attempted to pursue Estelle. To the contrary, the evidence demonstrated that after punching Estelle, Smith walked away from Estelle's residence and back to his vehicle. Thus, within moments after Smith punched Estelle, Estelle was in the safety of his residence, with Smith, who made no attempt to enter the residence, some distance away. Rather than remaining in the safety of his residence, Estelle elected to leave his residence and walk toward Smith. Once Estelle cleared the boundaries of his residence, each step Estelle took toward Smith was a step taken in violation of his duty to retreat. *See Crowe*, 2019-Ohio-3986, at ¶ 19 (the trial court did not abuse its discretion by concluding that evidence did not support that defendant complied with his duty to retreat where defendant "moved toward [the victim] and met him in the middle of the room instead of attempting to escape through the front door"); *State v. Chandler*, 8th Dist. Cuyahoga No. 105246, 2017-Ohio-8573, ¶ 17 (defendant was properly denied instruction on defense of another where the defendant's wife "was in the safety of her home, with the victim a significant distance away" when the victim was shot and wife "could not have claimed self-defense if she were the one confronting the victim in the parking lot after the fact"); *State v. Waller*, 2d Dist. Clark No. 2013-CA-26, 2014-Ohio-237, ¶ 50-51 (self-defense instruction was properly denied where instead of retreating from

victim, defendant "got angry" and moved toward victim). Accordingly, we conclude that the trial court did not abuse its discretion by refusing to instruct the jury on self-defense.

### iv. The trial court did not abuse its discretion by refusing to instruct the jury on voluntary manslaughter.

{¶25} Lastly, Estelle argues the trial court abused its discretion by refusing to instruct the jury on voluntary manslaughter. Estelle contends that because Smith "stormed onto [his] property, screamed at his wife, punched him such that he fell onto the steps of his front porch, and generally escalated a family disagreement into a neighborhood disturbance," a reasonable jury could conclude that he was "directed by passion rather than reason" when he shot Smith.

{¶26} The offense of voluntary manslaughter is set forth in R.C. 2903.03, which provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." R.C. 2903.03(A). "Voluntary manslaughter is an offense of an inferior degree to murder." *State v. Thomas*, 9th Dist. Summit No. 27266, 2015-Ohio-2935, ¶ 27. "[A] defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the

charged crime of murder and a conviction for voluntary manslaughter." *State v. Shane*, 63 Ohio St.3d 630, 632 (1992).

{¶27} "Before giving a voluntary-manslaughter instruction in a murder case, the trial court must determine 'whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 130, quoting *Shane* at paragraph one of the syllabus. "Whether the provocation was reasonably sufficient to prompt sudden passion or a sudden fit of rage involves both an objective and a subjective analysis." *State v. Lee*, 10th Dist. Franklin No. 17AP-908, 2018-Ohio-3957, ¶ 49. First, in the objective inquiry, the court must consider whether the alleged provocation was "reasonably sufficient to incite deadly force, meaning 'it must [have been] sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" *Id.*, quoting *Shane* at 635. "Then, if [the objective] standard is met, the inquiry shifts to the subjective component of whether [the defendant], in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Shane* at 634.

{¶28} After reviewing the record, we cannot say that the trial court abused its discretion by refusing to instruct the jury on voluntary manslaughter. Even assuming that Smith's actions were sufficient to arouse the passions of an ordinary person beyond the power of his control, the evidence presented at trial did not

support that Estelle actually was under the influence of sudden passion or in a sudden fit of rage when he shot Smith. Estelle repeatedly testified that he was "scared" and "panicked" when he shot Smith. (Aug. 25-27, 2020 Tr. at 501-502, 513-514). Estelle also stated that he was "frightened" after Smith punched him and that he was "afraid" when he fired the first shot at Smith. (Aug. 25-27, 2020 Tr. at 512). In fact, when Estelle was asked on cross-examination whether he was "scared" or whether he was "really mad," Estelle responded that he "was scared" and that "[i]t was out of fear." (Aug. 25-27, 2020 Tr. at 513).

{¶29} "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). Indeed, a defendant's fear for his own safety or for the safety of others "does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute." *State v. Harris*, 129 Ohio App.3d 527, 535 (10th Dist.1998). Thus, "[s]hooting someone 'out of fear rather than rage or passion [does] not support a jury instruction for voluntary manslaughter.'" *State v. Hodge*, 10th Dist. Franklin No. 18AP-95, 2019-Ohio-4012, ¶ 39, quoting *State v. Stevenson*, 10th Dist. Franklin No. 17AP-512, 2018-Ohio-5140, ¶ 29. Accordingly, because the evidence did not support that Estelle was under the influence of sudden passion or in a sudden fit of rage when he shot Smith, we conclude that the trial court did not abuse its discretion by refusing to instruct the jury on voluntary manslaughter.

*See State v. Sanders*, 5th Dist. Stark No. 2018 CA 00004, 2019-Ohio-30, ¶ 42 (voluntary-manslaughter jury instruction properly refused where defendant testified that he shot the victims out of fear rather than while under the influence of sudden passion or in a fit of rage); *Thomas*, 2015-Ohio-2935, at ¶ 29 (same).

**{¶30}** Estelle's first and second assignments of error are overruled.

**B. Third and Fourth Assignments of Error:  Did the State present sufficient evidence that Estelle committed purposeful murder and does the evidence weigh in favor of finding that Estelle committed purposeful murder?**

**{¶31}** In his third and fourth assignments of error, Estelle challenges the evidentiary basis for the jury's finding that he committed purposeful murder.  In his third assignment of error, Estelle argues the State presented insufficient evidence to support that he committed purposeful murder because "[t]here was no testimony that [he] intended to harm the victim" and the shooting was "committed without any premeditation but in a state of great emotional disturbance."  In his fourth assignment of error, Estelle contends the evidence weighs against finding that he committed purposeful murder because there was no testimony that he specifically intended to harm Smith.

**{¶32}** However, we need not consider whether sufficient evidence supports the jury's finding that Estelle committed purposeful murder or whether the evidence weighs in favor of that finding.  "'[W]hen counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state

-23-

elects to have the defendant sentenced, the appellate court need not consider the sufficiency [or weight] of the evidence on the count that is subject to merger because any error would be harmless' beyond a reasonable doubt." *State v. Adkins*, 3d Dist. Allen No. 1-19-71, 2020-Ohio-6799, ¶ 39, quoting *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14.

{¶33} In this case, Estelle was found guilty of both purposeful murder in violation of R.C. 2903.02(A) and felony murder in violation of R.C. 2903.02(B). The trial court later determined these two offenses merged for purposes of sentencing, and the State elected to have Estelle sentenced on the felony-murder offense. Consequently, Estelle was not convicted of purposeful murder because the trial court merged the purposeful-murder offense with the felony-murder offense for purposes of sentencing. *See Adkins* at ¶ 40. "Indeed, the Supreme Court of Ohio has explicitly stated that a 'conviction' requires both a finding of guilt and a sentence." *Id.* Thus, Estelle was "convicted" only of felony murder, rather than both felony murder and purposeful murder, and if the evidence supports his felony-murder conviction, any error with respect to purposeful murder would be harmless. *Id.* at ¶ 39-40.

{¶34} Estelle, however, has failed to mount a challenge to the evidence underlying his felony-murder conviction. He implies error in the fact that "he also was not charged or convicted of any felonies of the first or second degree" in

connection with his felony-murder conviction, but he cites no legal authority for this claim. In the absence of a proper challenge to the sufficiency and weight of the evidence supporting Estelle's felony-murder conviction, we assume the evidence as to his felony-murder conviction is sufficient and that his felony-murder conviction is not against the weight of the evidence. *See State v. Stargell*, 2d Dist. Montgomery No. 26446, 2016-Ohio-5653, ¶ 57 ("Stargell here challenges the sufficiency of the evidence only as to Counts 1 and 3 [of aggravated felony murder], so we assume that the evidence as to Count 2 [of aggravated felony murder] is sufficient."). Consequently, any error in the jury's finding that Estelle committed purposeful murder is harmless. *State v. Adkins*, 2d Dist. Clark No. 2019-CA-45, 2020-Ohio-3296, ¶ 8 (overruling appellant's sufficiency and manifest-weight challenges to menacing count where menacing count merged with domestic-violence count, sentence was imposed for domestic violence, and appellant did not challenge evidence supporting domestic-violence count); *Stargell* at ¶ 57, 62 (where appellant challenged the evidence supporting two counts of aggravated felony murder, each of which merged into a third count of aggravated felony murder, without challenging the evidence supporting the third count of aggravated felony murder, any error in the verdicts on the first two counts of aggravated felony murder was harmless).

{¶35} Estelle's third and fourth assignments of error are overruled.

## IV. Conclusion

**{¶36}** For the foregoing reasons, Estelle's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**