[Cite as *State v. Cunningham*, 2025-Ohio-347.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Andrew J. King, J. |
| -vs- | Case No. 2023 CA 00161 |
| SHAUN CUNNINGHAM | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING: Criminal Appeal from the Court of Common
Pleas, Case No. 2022 CR 02363

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: February 3, 2025

APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
PROSECUTING ATTORNEY
VICKI L. DESANTIS
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

RUSSELL S. BENSING
600 IMG Building
1360 East Ninth Street
Cleveland, Ohio 44114

*Wise, J.*

{¶1}   Appellant, Shaun Michael Cunningham, appeals his convictions for murder and felonious assault with firearm specifications in the Stark County Common Pleas Court.

### FACTS AND PROCEDURAL BACKGROUND

{¶2}   Appellant, Shaun Michael Cunningham, was charged with one count of murder in violation of R.C. 2903.02(B)(D), 2929.02(B), an unclassified felony and one count of felonious assault in violation of R.C. 2903.11(A)(1) and/or (2), 2903.11(D)(1)(a), a felony of the second degree. Both counts contained three-year firearm specifications. The charges stemmed from the fatal shooting of T.C. on October 25, 2022.  Cunningham claimed that he had acted in self-defense.  There is no dispute that Cunningham shot and killed T.C. with a nine-millimeter caliber Fabrique Nationale Browning semi-automatic pistol. The pistol was found at Cunningham's residence on the kitchen counter with a mix of bullets in the magazine and a hollow point bullet in the chamber.

{¶3}   The issue in this appeal is whether the trial court committed plain error in failing to instruct the jury on the rebuttable presumption set forth in R.C. 2901.05(B)(2). R.C. 2901.05(B)(2) creates a rebuttable presumption that an accused acted in self-defense when using defensive force that is intended or likely to cause death or great bodily harm against a person who has entered the accused's residence or is in the process of unlawfully entering the accused's residence.

*The killing of T.C.*

{¶4}   T.C. was the father of four of Cunningham's grandchildren.  They had known each other for at least fourteen years, and Cunningham treated T.C. like a son.

{¶5}    On October 25, 2022, T.C. came to the house where Cunningham lived with his wife. Earlier that day, T.C.'s son was dropped off at the Cunningham home by Cunningham's sister in law who had picked the son up from a boxing training facility when T.C. and Cunningham's daughter, the mother of the child, got into an altercation.  The daughter asked her aunt to pick up her son and take him to the Cunningham home.

{¶6}    Around 8:00 that evening, T.C. came to the Cunningham home and demanded his son.  He was angry, yelling, screaming and kicking at the back door. Cunningham was at home playing video games with another grandson and his wife was upstairs with T.C.'s  son.  Two neighbors who lived a house away heard the commotion. One neighbor testified she heard somebody hollering "I just came to get my son, I just want to pick my son up, are you going to let me have my son." ... "I'm leaving but it's not over; I'll be back tomorrow to pick up my son" ... "What, now you got a gun, you're going to shoot me." Tr. 1B at 45.  And then she heard shots. The neighbor's son testified similarly that he heard loud banging and heard someone saying he was there to get his kids and he wasn't leaving without his kids.  "And then I heard a pause and I heard him say, you asked me to leave so I'm going to leave but I'll be back tomorrow to get my son, and it almost seemed like he had processed the situation what was going on."  Tr.1B at 57.  The neighbor called 911.

{¶7}    Canton Police Officers Henderson and Angelo were working third shift that day and were dispatched to the Cunningham residence in response to the 911 calls reporting a disturbance.

{¶8}    They proceeded towards the driveway to the rear of the house and saw a male laying in the side yard. Their body cameras were activated.  The male was laying

on his back to the side of three concrete steps and a flat slab stoop of concrete with his feet by the stoop and his head in the grass in the side yard.  Backup was called and they moved the male to administer CPR.  An ambulance was dispatched and they placed the male on a backboard.  The male was wearing a white t-shirt and sandals. There were two doors in the back of the home; one with a small window and one without a window.  The male was found by the door without the window closest to the driveway where a BMW SUV was parked. State's Exh. 3.  The male arrived at the Cunningham residence in the BMW titled to Cunningham's daughter.

{¶9}   The occupants of the home, including T.C.'s son and Cunningham's wife, were ordered out of the home and assembled in the back yard.  Cunningham came out with his hands raised.

{¶10}  The male was later identified as T.C.; he was pronounced dead at Aultman Hospital later that evening.

*Investigation into the killing*

{¶11} Canton City Detectives Szaniszlo and Romanin were assigned to investigate the killing.  They arrived at the scene about 8:30 pm and found a footprint or footprints that belonged to T.C. on the door next to the driveway.  They found a broken cell phone outside on the sidewalk and a sweatshirt in the grass that belonged to T.C. They found two, nine-millimeter shell casings in the grass and blood droppings on the second step of the outside three steps by the door.  From the placement of the shell casings, Detective Szaniszlo was able to determine that the shots were fired outside of the home.

{¶12}  Later testing revealed no gunshot residue on the white t-shirt that T.C. was wearing, no blood or DNA from T.C. on Cunningham's clothing, and Cunningham's DNA on the grip of the pistol.  No weapon was found on or near T.C. including a firearm or a knife. The BMW SUV that was found in the driveway was searched and no weapon was found.

{¶13}  The Detective opined that Cunningham was standing in the doorway when he shot T.C.  outside in the yard.

{¶14}  An autopsy was performed on T.C.  He was 31 years of age, height six foot and weighed 156 pounds; a well-nourished, healthy appearing adult.  One gunshot wound was found in the back of his head one-half inch from the middle grid line towards the top of his head.  Tr. 2 at 98. Pieces of the bullet and metal jacket were found embedded in his brain, and the coroner opined that the bullet traveled right to left through the occipital lobes.  The coroner looked for black gunpowder soot called stippling.  Stippling is caused when the firearm is fired maybe two or three feet away.  If the firearm was very close to the head, the coroner would expect to find stippling.  The coroner found no stippling.  Tr. 2 at 106.

{¶15}  The coroner opined that T.C. died from a single gunshot wound to the head – a homicide.

{¶16}  Cunningham and his wife were among the persons interviewed by the Detectives.  Cunningham's wife had placed a 911 call at the time T.C. was at the home. Cunningham and T.C. could be heard yelling at each other.  Cunningham was just as aggressive as T.C. and did not seem startled, afraid, scared or panicked.  Cunningham's wife claimed in the 911 call that T.C. had a knife.  She told the police to get there because

her daughter's boyfriend was "acting like an idiot" and before her "husband does something." Gunshots could be heard on the 911 call at 2:16 minutes and 2:22 minutes.

{¶17} Cunningham's story changed several times during the detective's interview when he was presented with evidence from the scene. At one point, Cunningham claimed that T.C. charged him while he was standing in the doorway and said he would kill everyone in the house. He fired a warning shot and then another shot and T.C. fell to the ground.

### Indictment and trial

{¶18} On December 17, 2022, the Stark County Grand Jury returned an indictment charging Cunningham with one count of murder and one count of felonious assault. Each count carried a three-year firearm specification.

{¶19} Cunningham pleaded not guilty and, among the pretrial pleadings, filed a notice of self-defense under Crim.R. 12.2.

{¶20} At trial, the state presented seven witnesses including two neighbors, first responding police officers, and detectives who investigated the charges against Cunningham. Cunningham called four witnesses including his wife, his sister in law and Scott Roder, who testified to an animation he had created of the fatal shooting based on his review of the evidence. Roder opined that there were six seconds between the two shots, and that T.C.'s head was above the second step when the fatal shot was delivered. Tr. 3 at 94-99. Cunningham testified in his own behalf.

### Cunningham's testimony

{¶21} Cunningham testified that T.C. was his daughter's boyfriend and the father of her children. He was basically a part of the family for 14 years, and he used to introduce

T.C. as his son. He recalled that day that his wife told him that T.C. was coming over and that he was pissed about something.

{¶22} Cunningham testified he heard T.C.'s car coming up the drive and could hear him yelling back and forth with his wife from the upstairs window. He grabbed the firearm from the kitchen cupboard and made his way to the back door. Cunningham claimed he did not intend to use the firearm, but rather he grabbed it because it was the victim's gun and T.C. knew where it was located.

{¶23} Cunningham claimed that T.C. was coming in the door, and he stood in front of the door with his foot, knee and elbow there to block him. The back door was just cracked open. T.C. was yelling past him at his wife, who was now on the upstairs landing.

{¶24} Cunningham claimed he was talking to T.C. through the crack in the door, and T.C. said "[G]o get my son and ain't no one going to fucking stop me." "And I said, T.C., go home and calm the fuck down and... I mean it's no secret; I mean you're going to hear me yelling too ... that's the way I had to talk to [T.C.]. You have to get [his] attention that way ..." Tr. 3 at 15.

{¶25} Cunningham claimed that he tried to shut the door and knocked T.C. off balance and he fell or stumbled backwards off the steps. He claimed he could not get the door shut all the way because a rug caught in the doorjamb of the door, but he did get the bottom door locked, just not the deadbolt. Cunningham claimed T.C. was still arguing with his wife, banging on the door, and he thought T.C. was hitting the door with his cell phone and that the cell phone was a knife. Cunningham stated T.C., at one point, kicked the door open.

**{¶26}** T.C. was in the yard, the grass part, and Cunningham bent down to pull the rug out and close the door. Cunningham then claimed that T.C. took his sweatshirt off in the backyard and wanted to fight. Cunningham stated he could not fight because of his medical disability, and T.C. then pulled something black out of his waistband. Cunningham testified he thought it was a knife.

**{¶27}** Cunningham claimed T.C. started coming toward the door and so he "fired a shot away from him, and that's why that one shell casing is further than the other one." Tr. 3 at 33. "It was a warning shot to let him know that I'm going to shoot. I've told him already, he asked me earlier in the … you'll hear it in the vide … in the recording where he said, Are you going to shoot me, Shaun? I said, Yes. If you come through this door, [T.C.], yes, I will; don't come through the door, [T.C.]. Tr. 3 at 34.

**{¶28}** Cunningham claimed that T.C. said "It's on now, I'm going to kill everybody, and he charged me, and at the last second I raised my arm, I never put him in my sights ... I've never aimed a gun ... and I pulled the trigger." Tr. 3 at 35. He watched T.C. close his eyes and fall backwards. Cunningham claimed he was in fear of his life but earlier said T.C. was not threatening him when he was trying to come through. Tr. 3 at 18. "I'm saying at the last second I made a decision to shoot because he was going to come through me and he was in full, full charge and he was coming at me and I raised it up, pulled the trigger." Tr. 3 at 60.

*Jury Instructions on self-defense*

**{¶29}** In its jury charge, the trial court included an instruction on self-defense in accordance with the amended R.C. 2901.05(B)(1): "The Defendant is allowed to use deadly force in self-defense. Evidence has been presented that, if believed, tends to

show that the defendant may have acted in self-defense.  The State must prove beyond a reasonable doubt that the Defendant, when using deadly force, did not act in self-defense.  Tr. 3 at 138-139, 149-150.  The trial court also instructed that "in this case, the Defendant had no duty to retreat."  Tr. 3 at 143, 153.

*Verdict and Sentencing*

**{¶30}** The jury found Cunningham guilty on all counts and specifications.  The trial court imposed an aggregate sentence of 18 years to life in prison.

**{¶31}** Cunningham filed a timely appeal arguing two assignments of error:

## ASSIGNMENTS OF ERROR

**{¶32}** "1.  THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY ON THE PRESUMPTION OF SELF-DEFENSE AS CONTAINED IN R.C. SECTION 2901.05(B)(2).

**{¶33}** "2.  DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN DEROGATION OF DEFENDANT'S RIGHTS AS PROTECTED BY THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 5, 10 AND 16 OF THE OHIO CONSTITUTION."

## ANALYSIS

### I.

*Plain Error*

**{¶34}** In his first assignment of error, Cunningham contends that the trial court committed plain error in failing to instruct the jury on the presumption of self-defense set forth in R.C. 2901.05(B)(2).  Although Cunningham specifically received a self-defense jury instruction at trial and an instruction that he had no duty to retreat, he did not request

an instruction on the presumption of self-defense contained in R.C. 2901.05(B)(2), and that instruction was not given.

**{¶35}** Cunningham and the state agree that this Court is limited to a plain error review under Crim.R. 52(B). *State v. Kiehl,* 2016-Ohio-8543, ¶ 25 (11th Dist.) ("If there was no formal objection and the record does not reveal a material dispute over the jury instructions, appellate review must be limited to plain error under Crim.R. 52(B)."); *State v. Gasper,* 2024-Ohio-4782, ¶ 14 ("A defendant who fails to object to jury instruction waives all but plain error.")

**{¶36}** To establish plain error, a defendant must show that an error occurred, that the error was plain, meaning "obvious", and that it affected the defendant's substantial rights; it affected the outcome of the trial. *State v. Sowders,* 2023-Ohio-4498, ¶ 11 (1st Dist.); *accord State v. Williams,* 2021-Ohio-443, ¶ 30 (5th Dist.). Even if an obvious error is found to have impacted substantial rights, the error should only be corrected where it "seriously affects the fairness, integrity, or public reputation of judicial proceedings" or when necessary "to prevent a manifest miscarriage of justice." *State v. Bond,* 2022-Ohio-4150, ¶ 35.

**{¶37}** The trial court must give all instructions that are relevant and necessary for a jury to weigh the evidence and discharge its duty as the factfinder. *State v. Comen,* 50 Ohio St.3d 206 (1990), paragraph two of the syllabus; *State v. Rainey,* 2023-Ohio-4666, ¶ 29 (1st Dist.). ("The jury must be given all instructions that were relevant and necessary for it to weigh the evidence and to discharge its duty as the factfinder.") Whether jury instructions correctly state the law is a legal issue that an appellate court reviews de novo. *State v. Dean,* 2015-Ohio-4347, ¶ 135.

{¶38} Cunningham contends that the plain error standard was met because the error affected his substantial rights, the third prong of a plain error analysis. (*Appellant's brief at 11*). "... Ohio courts have historically interpreted the third prong of the plain-error analysis as requiring the appellant to show that the error "affected the outcome of the trial." *State v. Rodriguez,* 2025-Ohio-53, ¶ 62, (1st Dist.); *State v. Jones,* 2020-Ohio-3051, ¶ 18 ("Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial.")

{¶39} Therefore, we consider whether the failure to give the presumption instruction contained in R.C. 2901.05(B)(2) deprived appellant of his ability to present an effective defense and that the outcome of his trial would have been different, i.e, affected his substantial rights.

*R.C. 2901.05(B)(2)*

{¶40} Under R.C.2901.05(B)(2),

> A person is presumed to have acted in self-defense ... when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or have unlawfully and without privilege to do so entered, the residence...occupied by the person using the defensive force.

{¶41} "Residence" means a "dwelling in which a person resides either temporarily or permanently or is visiting as a guest." R.C. 2901.05(D)(3). Dwelling includes an attached porch. R.C. 2901.05(D)(2) provides:

"Dwelling" means a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. As used in this division, a building or conveyance includes, but is not limited to, an attached porch, and a building or conveyance with a roof over it includes, but is not limited to, a tent.

{¶42} A person's driveway, however, is not defined as a dwelling under R.C. 2901.05(D)(2) because it does not constitute a part of the residence. *State v. Moore,* 2020-Ohio-4321, ¶ 21 (4th Dist.). So, too, a person's backyard is not defined as a dwelling under R.C. 2901.05(D)(2).

{¶43} The presumption of self-defense arises when the defendant uses deadly force while expelling or attempting to expel an intruder from the defendant's residence. "R.C. 2901.05(B)(2) clearly contemplates a scenario of a [home] invasion – i.e., the person against whom the defensive force is used is in the process of unlawfully and without privilege entering (or has entered) the defendant's residence ..." *State v. Estelle,* 2021-Ohio-2636, ¶ 15 (3rd Dist.) citing *State v. Nye,* 2013-Ohio-3783, ¶ 29 (3rd Dist.).

{¶44} R.C. 2901.05(B)(2) does not permit a defendant to pursue an intruder out of the residence. The presumption of self-defense set forth in R.C. 2901.05(B)(2) is not a "license to kill." *State v. Montgomery,* 2015-Ohio-4652, ¶ 14 (12th Dist.).

{¶45} "In order for a defendant to receive the benefit of a jury instruction on the presumption contained in R.C. 2901.05(B)(2), the trial court must focus on the conduct and location of the victim at the time the defendant claims to be acting in self-defense.

*State v. Estelle, supra* at ¶ 16. *State v. Robinson,* 2023-Ohio-2352, ¶ 30 (11th Dist.) ("For a defendant to receive the benefit of a jury instruction on the presumption set forth in R.C. 2901.05(B)(2), the trial court must focus on both the conduct and location of the victim at the time the defendant asserts the affirmative defense ...").

**{¶46}** In this case, the evidence established that T.C. was not in the process of attempting to enter Cunningham's residence when he was shot by Cunningham. Even if Cunningham is correct that T.C. tried to kick in the door earlier when his footprint was found on it, the evidence presented established that T.C. had calmed down and was leaving the residence when he was shot. Neighbors heard T.C. say that it was not over and he would come back tomorrow for his son. T.C. was found outside in the side grassy area. The bullet entered the back of his head demonstrating that he was walking away from the residence. There was no gunshot residue found on his t-shirt, indicating that he was shot from a distance farther than two feet from Cunningham. The coroner found no stippling on T.C.'s body during the autopsy. He was found with no weapon – a firearm or a knife.

**{¶47}** The evidence did not demonstrate that T.C. was shot by Cunningham while he was inside the residence or attempting to enter Cunningham's residence.

**{¶48}** So, too, the jury was instructed that Cunningham had no duty to retreat, and that the state was required to prove beyond a reasonable doubt that Cunningham did not act in self-defense. Cunningham cannot demonstrate that the outcome of the trial would have been different if the jury was given the rebuttable presumption instruction.

**{¶49}** In *State v. Kerens,* 2021-Ohio-127 (5th Dist.), defendant was charged with murder for stabbing his co-worker in his apartment. He claimed self-defense, and the jury

was instructed that the state must prove beyond a reasonable doubt that the defendant did not use deadly force in self-defense. *Id.* at ¶ 37. The jury was also instructed that the defendant had no duty to retreat. *Id.* at ¶ 38. Defendant was convicted and appealed to this Court, alleging, inter alia, that the trial court committed "harmful" error when it failed to instruct the jury on the rebuttable presumption contained in R.C. 2901.05(B)(2). Because the defendant did not request the jury instruction, it was reviewed for plain error.

**{¶50}** This Court found no plain error because a manifest miscarriage of justice did not occur. "Even had the jury had [sic] been instructed that Kerens was presumed to have acted in self-defense, the jury was instructed and found in the case at bar that the state had rebutted any finding that Kerens had acted in self-defense beyond a reasonable doubt. We find the trial court's instruction did not rise to the level of plain error because the outcome of the trial would not have been otherwise had the presumption instruction been given." Citations omitted. *Id.* at ¶ 41.

**{¶51}** Cunningham cites *State v. Jones,* 2022-Ohio-3162 (2nd Dist.) and *State v. Robertson,* 2023-Ohio-2602 (1st Dist.) to support his position that the trial court committed plain error in failing to give the rebuttable presumption instruction contained in R.C. 2901.05(B)(2). But neither of those cases involved the plain-error analysis that is mandated here.

**{¶52}** We find that the trial court did not commit plain error when it failed to instruct the jury on the presumption contained in R.C. 2901.05(B)(2). The outcome of the trial would not have been different had the presumption instruction been given.

*Harmless error*

{¶53} An exception to the outcome-determinative prong of the plain error analysis does not apply if the case involves a structural error. *State v. Bond,* 2022-Ohio-4150, ¶ 32.

> [A] structural error may affect substantial rights even if the defendant cannot show that the outcome of the trial would have been different had an error not occurred. To conclude otherwise would be to ignore the long-standing structural-error doctrine, the purpose of which 'is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. *Arizona v. Fulminante,* 499 U.S. 279, 309-310 (1991), quoting *Weaver v Massachusetts,* 582 U.S. 286, 295 (2017).

{¶54} But structural error is not implicated here. Failure to properly instruct the jury does not necessarily render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. *State v. Bleigh,* 2010-Ohio-1182, ¶ 119 (5th Dist.) citing *Neder v. United States,* 527 U.S. 1 (1999); *State v. Whitman* 2018-Ohio-2924, ¶ 53 (5th Dist.) (finding that harmless error rule of *Chapman v. California,* 386 U.S. 18 (1967) applies to trial court's refusal to give a requested jury instruction); *State v. Rengert,* 2021-Ohio-2561, ¶ 22 (5th Dist.) ("In reviewing the record, we find the instruction did not render the trial so fundamentally unfair that it could not be a reliable vehicle for determining appellant's guilt or innocence."). Accordingly, Cunningham's arguments are subject to a harmless error analysis.

{¶55} The trial court instructed the jury on the elements of self-defense and the proper law requiring the state to prove that the defendant did not act in self-defense.

Although the trial court did not give the presumption instruction, it did instruct the jury that the defendant did not have a duty to retreat.  The jury was instructed in relevant part:

> Self-defense.  The Defendant is allowed to use deadly force in self-defense. Evidence has been presented that, if believed, tends to show that the Defendant may have acted in self-defense. The State must prove beyond a reasonable doubt that the Defendant, when using deadly force, did not act in self-defense.  ... To prove that the Defendant, when using deadly force, did not act in self-defense, the State must prove beyond a reasonable doubt at least one of the following:
>
> 1.  The defendant was at fault in creating the situation giving rise to the physical harm caused or attempted to be caused to [T.C.]; or
>
> 2.  The defendant did not have reasonable grounds to believe that he was in imminent danger of death or great bodily harm; or
>
> 3.  The defendant did not have an honest belief, even if mistaken, that he was in imminent danger of death or great bodily harm; or
>
> 4.  The defendant violated a duty to retreat or escape to avoid the danger; or
>
> 5.  The defendant used unreasonable force.

**{¶56}** The jury was also instructed that defendant did not have a duty to retreat. Tr. 3 at 139-145.

**{¶57}** The instructions given by the trial court adequately covered the issues involved and did not impact Cunningham's ability to present an effective defense.

{¶58} The state's theory during closing argument was to focus on numbers 2, 3 and 5. The law is clear that the state is required to disprove only one of the elements of self-defense beyond a reasonable doubt to disprove a defendant's claim of self-defense. *In re N.K.,* 2021-Ohio-3858,¶ 15 (6th Dist.) citing *State v. Messenger,* 2021-Ohio-2044, ¶ 50.

{¶59} The evidence demonstrated that defendant did not have reasonable grounds to believe that he was in imminent danger of death or great bodily harm. T.C. had no firearm, and Cunningham never testified that he was carrying a firearm. Cunningham and his wife made some assertions that T.C. was carrying a knife, but that was quickly dispelled during trial when Cunningham admitted that T.C. carried no knife or other weapon.

{¶60} The rebuttable presumption contained in R.C. 2901.05(B)(2) would have been rebutted by a preponderance of the evidence, i.e, more likely than not. Even if the jury had been instructed on the presumption, it would have found the state proved that Cunningham did not act in self-defense beyond a reasonable doubt.

{¶61} In *State v. Rengert,* 2021-Ohio-2561 (5th Dist.), defendant wife was charged with felonious assault for stabbing her husband in their home. She was convicted and appealed arguing, inter alia, that she was entitled to a Castle Doctrine instruction [no duty to retreat]. The trial court failed to so instruct the jury, and defendant never requested one.

{¶62} This Court found that, indeed, defendant was entitled to a "no duty to retreat" instruction because she was in her home. *Id.* at ¶47. Applying a plain error review, this Court analyzed the evidence and found that although she was entitled to the

Castle Doctrine instruction, she did not demonstrate any error that affected her substantial rights and the outcome of the trial would have been different but for the error:

Sufficient evidence was presented for the state to prove, beyond a reasonable doubt, that appellant was at fault in creating the situation giving rise to the affray and did not have a bona fide belief that she was in imminent danger of death or great bodily harm for which the use of deadly force was her only means of escape. *Id.* at ¶ 48.

**{¶63}** This Court affirmed her conviction. *Id.* at ¶ 83.

**{¶64}** In this case, even if Cunningham was entitled to a rebuttable presumption defense, it did not affect his substantial rights, and the outcome of the trial would not have been different.

**{¶65}** We, therefore, additionally conclude that any conceivable error in not giving the presumption of self-defense instruction was harmless as a matter of law and did not result in a manifest miscarriage of justice. The jury charge taken as a whole was adequate and fair for the evidence presented at trial.

**{¶66}** Appellant's first assignment of error is overruled.

**II.**

**{¶67}** In his second assignment of error, Cunningham contends that his trial counsel was ineffective when he failed to request a jury instruction on the presumption contained in R.C. 2901.05(B)(2).

**{¶68}** To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the

defendant resulting in an unreliable or fundamentally unfair outcome of the proceedings. *Strickland v. Washington,* 466 U.S. 668, 667-688 (1984); *State v. Watson,* 2023-Ohio-3137, ¶ 29 (5th Dist.). Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Condor,* 112 Ohio St.3d 377, at ¶ 62.

{¶69} Reviewing courts must conduct an objective review which include a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. *W*iggins v. Smith, 539 U.S. 510, 523 (2003).

{¶70} In support of his claim of ineffective assistance, Cunningham argues that trial counsel was deficient because he did not adequately research the law on self-defense and insist on the presumption set forth in R.C. 2901.05(B)(2). But there is no explicit case law from this Court or binding precedent from the Supreme Court that the facts in this case merit a R.C. 2901.05(B)(2) jury instruction. As noted above, the cases establish that such an instruction is most likely given in a home invasion scenario. Here, the evidence established that T.C. never entered the Cunningham residence. The credibility of Cunningham's claim that T.C. charged him at the back door was severely undermined by the testimony of the neighbors and the position of T.C. at the time he was shot in the back of his head. There was no stippling found on T.C. and no gunshot residue found on his clothing, undermining appellant's testimony that T.C. was charging him at the door to the residence.

{¶71} And as noted by appellee, the *Strickland* standard compels a finding that the outcome of the trial would have been different. The jury instruction here properly told

the jury that the state had to prove that the defendant did not act in self-defense beyond a reasonable doubt. So, too, the jury was told that Cunningham had no duty to retreat.

**{¶72}** Even if we assume for the sake of argument that his trial counsel's representation was deficient, Cunningham cannot show prejudice. Based on our disposition of the first assignment of error, Cunningham's trial was not fundamentally unfair or unreliable.

**{¶73}** The second assignment of error is overruled.

## CONCLUSION

**{¶74}** For the reasons stated above, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.

By: Wise, J.

Gwin, P. J., and

King, J., concur.

JWW/kt 0121