[Cite as *State v. Houle*, 2023-Ohio-4609.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,                      CASE NO. 9-23-31

       PLAINTIFF-APPELLEE,

       v.

LOGAN KEITH HOULE,                **O P I N I O N**

       DEFENDANT-APPELLANT.

**Appeal from Marion County Common Pleas Court**
**General Division**
**Trial Court No. 21-CR-204**

**Judgment Affirmed**

**Date of Decision:  December 18, 2023**

**APPEARANCES:**

     *Kyle Phillips* **and** *Philip E. Pitzer* **for Appellant**

     *Raymond Grogan* **for Appellee**

**Waldick, J.**

**{¶1}** Defendant-appellant, Logan Houle ("Houle"), brings this appeal from the April 6, 2023, judgment of the Marion County Common Pleas Court sentencing him to prison after a jury convicted him of Aggravated Robbery and Obstructing Official Business. On appeal, Houle argues that the trial court erred by denying his suppression motion, that the trial court erred by failing to provide jury instructions on excessive force, lawful resisting, and self-defense, that the trial court erred by excluding testimony from an expert witness, and that his convictions should have merged for purposes of sentencing. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

**{¶2}** On May 19, 2021, Houle was indicted for Aggravated Robbery in violation of R.C. 2911.01(B), a first degree felony, and Obstructing Official Business in violation of R.C. 2921.31(A)/(B), a fifth degree felony. It was alleged, *inter alia*, that Houle struggled and fought with three police officers while they were attempting to detain him during an investigation and that, during the struggle, Houle attempted to remove a law enforcement officer's firearm from the officer's holster. Houle pled not guilty to the charges.

**{¶3}** On March 28, 2022, Houle filed a suppression motion arguing, *inter alia*, that his initial detainment was illegal and that his arrest was unreasonable and

illegal under the circumstances presented. A hearing was held on Houle's suppression motion and the motion was ultimately overruled by the trial court.

{¶4} On February 7-9, 2023, Houle proceeded to a jury trial wherein he was convicted of both charges against him. On April 6, 2023, Houle was sentenced to serve an indefinite prison term of 9 to 13.5 years on the Aggravated Robbery charge and a concurrent 12 months in prison on the Obstructing Official Business charge. It is from this judgment that Houle appeals, asserting the following assignments of error for our review.

**First Assignment of Error**

**The trial court erred in denying defendant-appellant's motion to suppress all evidence obtained as a result of the excessive force employed upon Logan Houle during his illegal arrest.**

**Second Assignment of Error**

**The trial court erred and abused its discretion in failing to provide jury instructions on excessive force, lawful resisting, and self-defense.**

**Third Assignment of Error**

**The trial court erred to the substantial prejudice of defendant-appellant and abused its discretion in excluding testimony from appellant's expert witness and prohibiting him from testifying at the jury trial.**

**Fourth Assignment of Error**

**[The] [t]rial court committed plain error in sentencing defendant-appellant to concurrent sentences for both Aggravated Robbery and Obstructing Official Business as the counts should have merged.**

*First Assignment of Error*

**{¶5}** In his first assignment of error, Houle argues that the trial court erred by denying his suppression motion. Specifically, he contends that his initial detainment and his subsequent arrest were illegal and excessive under the circumstances. He also argues that the third-party individual's call to dispatch did not support a reasonable articulable suspicion of criminal activity on its own to justify a detainment.

Standard of Review

**{¶6}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id*.; *State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

Evidence Presented

{¶7} At the suppression hearing, the State presented the testimony of the three officers who responded to 623 Tyler Street on May 13, 2021, and a 911 dispatcher. The body camera footage from all three responding officers was introduced into evidence. The defense presented the testimony of one witness who was classified as an expert in "General Law Enforcement and Arresting Procedures." The trial court's entry overruling Houle's suppression motion contained detailed factual findings based on the evidence presented. Because the trial court's findings are supported by competent credible evidence and the findings thoroughly detailed the evidence, we quote them in their entirety.

> On or about May 13, 2021, officers from the Marion, Ohio Police Department were dispatched to 623 Tyler Street in reference to a male in an apartment with a knife threatening one to two females inside. The call to dispatch was made by an identified individual who had received a text message from one of the females inside. When dispatch called for officers, a "tone was dropped," which is a signal to officers responding that the call was a high priority and had a high potential for danger based on the nature of the call.
>
> Officer Jagger was the first to arrive on the scene. Upon arrival, there was nothing unusual and there was no noise coming from inside the apartment. Officer Jagger knocked on the door and a male answered the door. Officer Jagger mistakenly asked if his name was "Tyler," to which the Defendant said "No." He was identified as "Logan" (he was later identified as Logan Houle, the Defendant in the instant matter) and Officer Jagger asked him to step outside. Officer Jagger attempted to reach out to the Defendant and the Defendant retreated into the apartment. Two females were seen by Officer Jagger standing in the apartment, neither of which had any visible injury. The Defendant asked why he needed to step outside. Officer Jagger explained that there had been a phone call stating he had been in the

residence with a knife. The Defendant immediately escalated the situation by becoming verbally combative and yelling while clinching his fists. The Defendant then began making accusations that the two residents were lying. The Defendant began yelling "These bitches is lying."

**{¶8}** Officer Jagger stated that he needed to step outside so she could check the Defendant for weapons for officer safety. The Defendant was aggressive from the outset and appeared defensive and agitated upon his initial interaction with Officer Jagger, however, after his initial retreat into the apartment and resistance to step outside, he cooperated in stepping outside of the apartment and acquiescing to a pat down search for weapons. A pat down for weapons was conducted outside of the apartment and nothing was found on [Houle's] person.

> About this time, less than one minute into the interaction between Officer Jagger and Defendant, Lt. Musser and Officer May arrived to assist on the call. The Defendant immediately asked "what are they doing, though?" referring to the other officers who arrived on scene. The Defendant was asked what was going on and he replied that nothing was going on, that everything was fine, and that he didn't know what Officer Jagger was talking about in regards to someone with a knife. The Defendant stated he did not live at the residence and had been there a couple hours. Officer Jagger leaves the Defendant with Lt. Musser and proceeds to enter the residence with Officer May to secure the scene, make sure there was no one else inside, either with a knife or who was injured. At this point, officers were unsure who allegedly had a knife. A knife was located out on a counter in the kitchen area.
>
> While Officers Jagger and May secured the apartment, the Defendant talked with Lt. Musser outside. The Defendant went to shake the hand of Lt. Musser. Lt. Musser calmly explained that he could not due to COVID restrictions. The Defendant backed away and

paced while he talked to Lt. Musser. The Defendant stated that one of the females was his girlfriend and called her "crazy" and tried to move in close to Lt. Musser. Lt. Musser asked him to step back. He stepped back to [sic] and continued to talk with Lt. Musser. The Defendant's behavior during his interaction with Lt. Musser fluctuated rapidly between trying to shake hands and smiling to being agitated and defensive, all while being unable to stand still and pacing.

The Defendant indicated that he had texts from his girlfriend inviting him [to the apartment]. He said his phone was inside but he did not want to show it to the officers. The Defendant then asked to go inside to get his phone. Before Lt. Musser responded, the Defendant swiftly turned to go into the apartment to retrieve his phone. Lt. Musser said "Hang on" and twice told him not to go in because he did not live there.

The Defendant approached the door. Officer May was in the doorway with the two residents also outside talking with Officer May.

The Defendant disregarded Lt. Musser's instruction and moved to enter the residence. The Defendant moved towards Officer May and told him he "would be pissed" if the officers had his phone. Lt. Musser approached and repeated that the Defendant should not go in because he did not live there. The Defendant said something about his phone to the two females standing outside the doorway and pointed at them.

The Defendant continued to move in very close to Officer May. Officer May put his open hand out to stop the Defendant from entering the apartment. The Defendant tried to push past Officer May. Officer May directed the Defendant to back up.

Having disregarded multiple orders to not enter the residence and repeated instructions to stay back from the officers, Lt. Musser pulled out his handcuffs to detain the Defendant. The Defendant turned around, immediately pushed Lt. Musser, and attempted to flee. Lt. Musser testified that at that moment, he was detaining the Defendant so that they could finish their initial investigation. The Defendant pushed Lt. Musser and attempted to flee on foot less than three minutes after Officer Jagger's initial contact and less than two minutes after Lt. Musser and Officer May's arrival on scene.

-7-

Nearly immediately after pushing away from Lt. Musser, Officer May was able to bring the Defendant to the ground. A struggle ensued with all three officers attempting to detain the Defendant. After one minute of struggling, one handcuff was finally able to be placed on the Defendant. The Defendant then pulled his arms free with one handcuff and reached and pulled on Officer May's holstered gun. At this point, the struggle escalated. Officer May was able to reach one hand back and hit the Defendant's hand from his gun.

During the struggle, Officer Jagger attempted to secure the Defendant's lower half by wrapping up his legs while Officer May admittedly had a hold around the Defendant's neck and shoulder area. Officer May testified that, while he had a hold of the Defendant by the neck and shoulders, he was not applying pressure to the Defendant's neck. It was not until the Defendant pulled on Officer May's gun that he applied pressure to the Defendant's windpipe briefly to gain compliance. This testimony is corroborated by the body cam videos. While the Defendant at one point states that he can't breathe, it appears that this is right after being sprayed in the face with mace. During a nearly three minute struggle, the Defendant was tased multiple times and sprayed in the face with mace.

During the initial three minutes of the struggle, the Defendant repeatedly failed to comply with the officers' instructions to stop resisting. The Defendant flailed, kicked, evasively moved his limbs, and did anything possible to not comply with the officer's attempts to detain him, even after being tased, drive stunned, and maced.

The Defendant was told to put his hands behind his back. There was also a warning that the officers were going to tase the Defendant. The officer told him once the cuffs were on, the officer would let the Defendant back up. The Defendant then attempted to fight with the officers further.

This resistance led to the officers using the taser a number of times. Defendant offered Exhibit "F" which is a taser report showing the taser was deployed five times in the span of one minute. It was not possible to determine how many of those taser deployments actually made contact with the Defendant given the struggle. The Defendant was also maced at least twice.

As soon as Lt. Musser was able to secure the Defendant in handcuffs, Officer May got off the Defendant. The Defendant appeared to stop resisting and was brought to his feet.

The Defendant then failed to comply with the officers orders while on his feet. The Defendant asked officers to "please stop" multiple times but was resisting and tensing up while doing so. He was taken to the ground again by Officer May. He was pinned there by Officer May and was given water to clear his eyes from the mace by the officers. Shortly thereafter, EMS arrived on the scene to give attention to the Defendant. The Defendant was ultimately walked to the stretcher to take the Defendant to the hospital.

The Defendant presented testimony from Ron Scheiderer, who was qualified, over the State's objection, as an expert in "General Law Enforcement and Arresting Procedures." Mr. Scheiderer opined that Lt. Musser did not have the authority to detain the Defendant. Mr. Sheiderer [sic] also opined that the Officers did not follow proper procedures by utilizing "chokeholds" and using profane language.

(Doc. No. 116).

Analysis

{¶9} Houle argued to the trial court that officers lacked authority to "arrest" him when he was first approached by Lt. Musser with handcuffs. The trial court denied his suppression motion and Houle now renews his argument on appeal.

{¶10} Contrary to Houle's argument, and as the trial court determined, Lt. Musser did not approach Houle initially with his handcuffs to "arrest" him; rather, Lt. Musser approached Houle to place him under an investigatory detention. A reasonable suspicion is all that is required for an investigative detention, which is less than the probable cause standard for arrest. *State v. Hairston*, 156 Ohio St.3d

363, 2019-Ohio-1622, ¶ 10. Thus any arguments related to Houle's "arrest" are premature given that Houle was only being detained when he was approached by Lt. Musser.

**{¶11}** Here, Lt. Musser needed a reasonable suspicion to justify an investigative detention when he approached Houle with the handcuffs. *Id.* Reasonable suspicion for an investigatory stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). To determine whether an officer had reasonable suspicion for an investigatory "*Terry*" stop or detention, the totality of the circumstances must be considered and viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold. *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, ¶ 21.

**{¶12}** In this case, at the time Lt. Musser attempted to detain Houle, an identified citizen informant had told police that he believed the mother of his children was in an apartment in Marion perhaps with another female being threatened by a man with a knife. Officers were dispatched to the apartment with a "tone" meaning that the situation could be dangerous. The first officer to arrive found Houle to be evasive and combative, including balling his fists. She also believed that Houle may have been "high" on some type of drug.

**{¶13}** Although Houle did allow himself to be patted down, once he was outside the apartment he was continuously pacing and approaching the officers

while they were trying to investigate the matter. Houle then began talking about his cell phone and he indicated that he wanted to go get it, so he tried to go into the apartment where he had already stated he did not live, even though the doorway was blocked by an officer. Houle told the officers that they better not have his phone.

{¶14} Houle's relatively erratic activity prompted Lt. Musser to pull out his handcuffs to detain Houle so the officers could speak with everyone present and learn what had occurred at the scene. Under the totality of the circumstances, this was sufficient at the time for Lt. Musser to pull out his handcuffs and attempt to briefly detain Houle so that the matter could be investigated. *See State v. Everett*, 11th Dist. Lake No. 2018-L-142, 2019-Ohio-2397, ¶ 35 ("When a police officer makes a stop supported by reasonable suspicion, he is authorized to take such steps as reasonably necessary to protect his personal safety and to maintain the status quo during the course of the stop" such as handcuffing an individual even if he is not yet under arrest.) Therefore, Houle's first argument is not well-taken.

{¶15} Houle next argues that the trial court erred by denying his suppression motion because he contends the third-party individual's call to dispatch was not corroborated. However, Houle's premise is flawed because officers at the scene specifically testified to the reasons beyond the call itself and why Houle was going to be detained. Lt. Musser specifically testified:

> he's being evasive. You know, I have to ask the same question
> multiple times. He walked up in my space. He had a blank stare on his
> face, saying she's crazy. The entire time, you know, he's kind of

Case No. 9-23-31

> pacing around. And then he went into the – tried to go into the apartment, and I thought it was a good idea – we're gonna detain him right now, sit him down, away from everything, so we can, you know, figure out what's going on at the scene.

(Tr. at 81-82). We find that Houle's detention was never based entirely on purportedly uncorroborated information from a citizen-caller.[1] Therefore, this argument is not well-taken.

{¶16} Finally, Houle argues that he was illegally arrested. However, at the time he was arrested Houle had fled from an investigative detention, had repeatedly and physically resisted the officers, and had tried to remove an officer's firearm from its holster. He committed violations of law directly in front of law enforcement and was properly subject to a lawful arrest. *See State v. Pitts*, 1st Dist. Hamilton No. C-220080, 2022-Ohio-4172, ¶ 16-17. Therefore we find no error here and Houle's first assignment of error is overruled.[2]

*Second Assignment of Error*

---

[1] Notably, some points from the caller's information were corroborated such as the number of people in the residence and that there was specifically 1 male and 1-2 females.

[2] We note that while Houle argues that law enforcement used excessive force in arresting him by employing a "chokehold," the only indication that any pressure was placed on Houle's throat was the officer testifying that when Houle grabbed the firearm and pulled on it, he then began choking Houle because it became a deadly force situation.

-12-

**{¶17}** In his second assignment of error, Houle argues that the trial court erred by failing to provide jury instructions on self-defense, excessive force, and lawful resisting.

Standard of Review

**{¶18}** We review a trial court's refusal to give a requested jury instruction under an abuse of discretion standard. *State v. Thompson*, 3d Dist. Henry No. 7-16-10, 2017-Ohio-792, ¶ 11. An abuse of discretion occurs when a trial court's decision was unreasonable, arbitrary, or capricious. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

Analysis

**{¶19}** Defense counsel requested jury instructions on self-defense, excessive force, and lawful resisting and these instructions were denied by the trial court. We will review each of the proposed instructions in turn.

**{¶20}** With regard to self-defense, the trial court determined, *inter alia*, that a self-defense instruction was not warranted here based on the evidence that Houle created the danger. After reviewing the evidence, we agree with the trial court. *See State v. Crowe*, 3d Dist. Allen No. 1-19-12, 2019-Ohio-3986 (indicating the trial court did not abuse its discretion by denying instruction on self-defense when evidence negated element of self-defense).[3] Moreover, Houle did not present

---

[3] We also note that Houle did not provide notice of self-defense under Crim.R. 12.2.

-13-

evidence that would tend to support an instruction for self-defense. *See State v. Estelle*, 3d Dist. Allen No. 1-20-50, 2021-Ohio-2636, ¶ 18 (a defendant claiming self-defense has the burden of production), Therefore, we find no abuse of discretion with the trial court declining to instruct the jury on self-defense.

{¶21} With regard to his request for a jury instruction on "excessive force," Houle proposed the following jury instruction: "**'EXCESSIVE FORCE'** 'An arrest is not lawful, under Ohio law, if the arresting officer(s) used excessive force.'"[4] (Doc. No. 145). In denying the proposed instruction, the trial court again found that the evidence did not support the instruction and we can find no abuse of discretion with this finding. Three officers attempted to subdue Houle and despite the force used they still had trouble subduing him. Testimony indicated that the only time any "deadly" force was used was *after* Houle tried to pull an officer's gun out of his holster. We do not find that the trial court abused its discretion and Houle's argument is not well-taken.

{¶22} Finally, Houle contended that a jury instruction on "lawful resisting" should have been provided to the jury. Specifically, Houle wanted the jury to be instructed that, "A person is privileged to resist an unlawful arrest." However, as the trial court noted in denying this instruction, the arrest had already been determined to be lawful at the suppression hearing. We have similarly found that

---

[4] Houle cited *White v. Ebie*, 191 F.3d 454, 1999 WL 775914, as support for his proposed instruction.

the arrest was lawful. Thus the instruction could only serve to confuse the jury, and we find no abuse of discretion in the trial court's determination. For all these reasons, Houle's second assignment of error is overruled.

*Third Assignment of Error*

{¶23} In his third assignment of error, Houle argues that the trial court erred by excluding testimony from his "expert" witness at the trial.

Standard of Review

{¶24} The admissibility of expert testimony is a matter committed to the sound discretion of the trial court and the trial court's ruling will not be overturned absent an abuse of that discretion. *State v. Waldock*, 3d Dist. Seneca No. 13-14-22, 2015-Ohio-1079, ¶ 62, citing *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9.

Analysis

{¶25} At the suppression hearing in this case, defense counsel presented the testimony of Ron Scheiderer. Over strenuous objection from the State, Scheiderer was classified as an expert in "General Law Enforcement and Arresting Procedures." Scheiderer testified, *inter alia*, that he felt that the officers in this case did not use proper procedures by employing a chokehold on Houle and by using profane language during the incident. He also opined that the officers lacked authority to detain Houle at the scene. Defense counsel sought to introduce Scheiderer's testimony again at trial, and the State again objected, indicating that

Scheiderer's testimony would not be helpful to the jury given that Houle's detainment and arrest had been ruled lawful by the trial court at the suppression hearing.

{¶26} The trial court allowed defense counsel to proffer Scheiderer's testimony and during his proffer Scheiderer testified, *inter alia*, that the altercation was unnecessary and escalated by the officers, that the chokehold was illegal, that Officer Jagger was belligerent and out of control because she used profanity and tased Houle, that the force used was excessive, that the charges were "stack[ed]" and "slinging mud on the wall and see what's gonna stick." (Tr. at 426). Scheiderer also testified that in his opinion it was not clear that Houle was attempting to remove the officer's gun from the holster, and that Houle could not have removed it anyway because of the locking devices in the holster.

{¶27} After hearing the proffered testimony, the trial court refused to permit Scheiderer to testify before the jury ruling, in part, as follows:

A lot of the testimony was factual interpretations that I think would be jury questions and it's his – not expert opinion. Some of those things were not expert opinions of his interpretation of certain facts. Some of what he said was speculative and inadmissible hearsay about a caller, about what Mr. Houle was thinking. So there were some things that would be inadmissible in that regard. I think at the suppression hearing he was deemed an expert in general law enforcement procedures and arresting procedures. My conclusion is that that issue has been decided. And I've decided that it was a lawful arrest, an investigatory detention that turned into a lawful arrest based on the suppression hearing. * * * So I think it would confuse the jury. So based on that testimony, I don't think I'm gonna allow that testimony. So that's the rule.

-16-

(Tr. at 440-441).

**{¶28}** Houle now argues that the trial court erred and should have permitted Scheiderer's testimony. However, we can find no abuse of the discretion in the trial court's determination, particularly given that the lawfulness of the detention and arrest had been determined at the suppression hearing.

**{¶29}** Moreover, Scheiderer was attempting to testify, in part, to ultimate issues in the case, which is generally inadmissible unless it is in an area of specialized knowledge. "[E]xpert opinion testimony as to the ultimate issue requires the application of expert knowledge not within the common knowledge of the jury." *State v. Beasley*, 11th Dist. Lake No. 2022-L-040, 2023-Ohio-670, ¶ 56. Here there is no indication that Scheiderer was going to provide testimony that was not within any common knowledge of a jury or was not within the ability of the jury to understand.[5] We can find no abuse of discretion and find that the trial court properly excluded Scheiderer's testimony. Therefore, Houle's third assignment of error is overruled.

*Fourth Assignment of Error*

---

[5] Houle also argues that rather than excluding Scheiderer's testimony altogether, the trial court should have permitted some testimony at least on the use of force, police training, and the use of chokeholds. However, we fail to see how this was relevant to the actual charges at issue given that the detainment and arrest were ruled lawful. We also note that the cases cited by Houle in his brief to attack the issues are either distinguishable or not relevant to our decision.

**{¶30}** In his fourth assignment of error, Houle argues that the trial court erred by failing to merge his convictions for purposes of sentencing. However, Houle acknowledges that he did not argue allied offenses at the trial court level, thus the matter must be reviewed for plain error.

### Standard of Review

**{¶31}** Generally we review whether offenses should merge for purposes of sentencing de novo. *State v. Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, ¶ 6. However, where a defendant fails to preserve the issue for appeal, we review the matter for plain error. *Id.*

**{¶32}** Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail under the plain-error doctrine, a defendant must establish that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial. *Bailey* at ¶ 8. The elements of the plain-error doctrine are conjunctive: all three must apply to justify an appellate court's intervention. *Id.*

### Relevant Authority

Revised Code 2941.25, Ohio's multiple-count statute, states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the

-18-

indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶33} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, the Supreme

Court of Ohio held the following with regard to determining allied offenses:

1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.

2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

The Supreme Court in *Ruff* explained:

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable

-19-

from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*Ruff*, 2015-Ohio-995 at ¶ 26.

Analysis

**{¶34}** Under the applicable legal authority, the offenses do not merge for purposes of sentencing in this case if, *inter alia*, the conduct was committed separately or there were separate victims for each of the offenses. Here, the Aggravated Robbery under R.C. 2911.01(B) was undertaken and completed when Houle grabbed the officer's firearm and pulled on it. By contrast, the Obstructing Official Business occurred multiple times when Houle ran from the officers, wrestled with the officers, and fought against the officers.

**{¶35}** In fact, Houle's actions related to Obstructing Official Business caused physical harm to multiple officers, separate and distinct from the harm related to the Aggravated Robbery. Officer Jagger was injured, one officer was struck with some of the mace and another officer took a taser in the hand while attempting to subdue Houle. Thus there were multiple victims of Houle's offenses. *See Ruff*, *supra*.

**{¶36}** Given that the acts in question were committed separately and there were separate victims for each offense, we do not find that the trial court committed

plain error by declining to merge the convictions for purposes of sentencing. Therefore, Houle's fourth assignment of error is overruled.

*Conclusion*

**{¶37}** Having found no error prejudicial to Houle in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Marion County Common Pleas Court is affirmed.

***Judgment Affirmed***

**MILLER, P.J. AND ZIMMERMAN, J., concur**

**/eks**